# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

***Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012**

---

| | |
|---|---|
| Caption in Supreme Court: | MICHAEL P. GAFFNEY, Appellant, v. THE BOARD OF TRUSTEES OF THE ORLAND FIRE PROTECTION DISTRICT *et al.*, Appellees.–BRIAN J. LEMMENES, Appellee, v. THE ORLAND FIRE PROTECTION DISTRICT *et al.*, Appellants. |
| Docket Nos. | 110012, 110198 cons. |
| Filed | February 17, 2012 |
| Rehearing denied | May 29, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The emergencies on which catastrophically injured firefighters' statutory continuing health care benefits may be based do not exclude training, but must be unforeseen; and circuit court relief could be sought against a fire board where it was not an agency whose rulings were subject only to administrative review—reversal of both circuit court denial of award for live-fire injuries and award as to a simulated fire. |
| Decision Under Review | Appeals from the Appellate Court for the First District; heard in that court on appeals from the Circuit Court of Cook County, the Hon. Nancy J. Arnold and the Hon. Richard J. Billik, Judges, presiding. |
| Judgment | No. 110012—Judgments reversed; cause remanded.<br>No. 110198—Appellate court judgment reversed. |

Counsel on Appeal

Thomas W. Duda and Adam M. Salzman, of Arlington Heights, for Michael Gaffney and Brian Lemmenes.

Dennis G. Walsh, James W. Fessler, Lance C. Malina and Jacob H. Karaca, of Klein, Thorpe & Jenkins, Ltd., of Chicago, for The Board of Trustees of the Orland Fire Protection District *et al.*

Gilbert Feldman, of Cornfield & Feldman, of Chicago, for *amicus curiae* Associated Firefighters of Illinois.

Charles E. Hervas, Michael D. Bersani and Zrinka Rukavina, of Hervas, Condon & Bersani, P.C., of Itasca, and Donald R. Zoufal, of Springfield, for *amicus curiae* the Illinois Association of Chiefs of Police.

Shawn P. Flaherty, of Ottosen Britz Kelly Cooper & Gilbert, Ltd., of Naperville, for *amici curiae* the Illinois Association of Fire Protection Districts and the Illinois Fire Chiefs Association.

Brian Day and Robert Huebner, of Springfield, for *amicus curiae* the Illinois Municipal League.

Robert J. Smith, Jr., and James J. Powers, of Seyfarth Shaw LLP, of Chicago, for *amicus curiae* the Illinois Public Employer Labor Relations Association.

Joel A. D'Alba and Margaret Angelucci, of Asher, Gittler & D'Alba, Ltd., of Chicago, for *amicus curiae* the Illinois AFL-CIO.

Justices

CHIEF JUSTICE KILBRIDE delivered the judgment of the court, with opinion.

Justices Freeman, Burke, and Theis concurred in the judgment and opinion.

Justice Garman concurred in part and dissented in part, with opinion, joined by Justices Thomas and Karmeier.

## OPINION

¶ 1      Plaintiffs Michael P. Gaffney and Brian J. Lemmenes were injured in the line of duty as firefighters and sought continuing health coverage benefits under section 10 of the Public Safety Employee Benefits Act (820 ILCS 320/10 (West 2006)). In *Gaffney*, the appellate court affirmed the denial of the plaintiff's application for benefits. In *Lemmenes*, the appellate court affirmed summary judgment in favor of the plaintiff on his complaint for declaratory judgment.

¶ 2      We allowed petitions for leave to appeal in both *Gaffney* and *Lemmenes* (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)) and consolidated the appeals for review. We also allowed the filing of several *amicus curiae* briefs. Ill. S. Ct. R. 345 (eff. Dec. 6, 2005). For the following reasons, we reverse the appellate court's judgment in both *Gaffney* and *Lemmenes*.

### I. BACKGROUND

#### A. No. 110012, Michael P. Gaffney

¶ 5      Gaffney filed a two-count complaint against the defendants, the board of trustees of the Orland Fire Protection District, Board President Patrick Maher, Board Secretary Patricia Corcoran, and the Orland Fire Protection District, seeking payment of health insurance benefits under section 10 of the Act (820 ILCS 320/10 (West 2006)). Section 10, in pertinent part, requires employers of full-time firefighters to pay health insurance premiums for the firefighter and his or her spouse and dependent children if the firefighter suffers a catastrophic injury under specified circumstances. 820 ILCS 320/10 (West 2006). The circumstances triggering eligibility for section 10 benefits include when a firefighter is injured as a result of a "response to what is reasonably believed to be an emergency." 820 ILCS 320/10(b) (West 2006).

¶ 6      In his complaint, Gaffney alleged that he was employed by the District as a firefighter. On July 27, 2005, he participated in a live-fire exercise and was instructed by the battalion chief to treat it as an actual emergency. He was wearing "full turnout gear." During the exercise, a fire hose became hooked around a "loveseat type chair." Gaffney moved the loveseat with his left arm to free the hose, suffering a catastrophic career-ending injury to his shoulder. He was awarded a line-of-duty disability pension.

¶ 7      Gaffney demanded payment of health insurance premiums under section 10 of the Act. The board of trustees responded with a "Decision and Order" stating it would not provide those benefits. Gaffney attached a copy of the board's decision and incorporated it by reference into his complaint.

¶ 8      The board's decision indicates that Gaffney filed an application for section 10 benefits, asserting that the exercise involved a live fire on the third floor of the building. His crew responded with the engine's lights and siren activated. The hose became entangled while his crew was advancing from the second floor to the third floor with "no visibility" through smoke and obstacles. Gaffney followed the hose back to where it was entangled in the loveseat. He moved the loveseat by flipping it backward, injuring his shoulder. Gaffney

asserted his catastrophic injury occurred while he was responding to what he reasonably believed to be an emergency.

¶ 9        Gaffney was given notice that his application would be considered at a "special meeting of the Board of Trustees." He was accompanied by counsel at the special meeting and gave a statement adding that prior to the exercise his crew was instructed to advance a hose line to the seat of the fire and to search for victims along the way. After injuring his shoulder, Gaffney went back up the hose line. When he reached the third floor, an officer noticed Gaffney was having trouble breathing because of the pain and the drill ended immediately. Gaffney had not worked as a firefighter since that day. In its decision, the board emphasized that Gaffney knew he was participating in a training exercise and the exercise was terminated after he was injured. The board concluded that Gaffney was not responding to what was reasonably believed to be an emergency and, therefore, denied his application for benefits under section 10 of the Act.

¶ 10       In the first count of his complaint, Gaffney sought a declaratory judgment compelling the defendants to pay health insurance premiums under the Act. The second count was labeled "in the alternative." In that count, Gaffney sought review of the board's decision under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2006)). Gaffney alleged the second count was included "purely for prophylactic reasons" and he did not agree or stipulate that the board's decision was subject to review under the Administrative Review Law. He further alleged that the board was not an administrative agency authorized to render a decision reviewable under the Administrative Review Law.

¶ 11       The defendants moved to dismiss the declaratory judgment count of the complaint under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2006)). The defendants asserted that Gaffney's factual allegations did not fit within the plain language of the Act requiring a response to what was reasonably believed to be an emergency. The defendants also claimed that the board's decision was a final administrative action subject only to administrative review or review under a common law writ of *certiorari*. The defendants attached a copy of an ordinance adopted by the board on May 14, 2003, providing a "policy regarding continuation of insurance benefits under the Public Safety Employee Benefits Act." The policy required employees seeking health insurance benefits to complete an application form that would be "reviewed to determine if the requirements of the Act have been met." The application form required the employee to describe the injury and the circumstances resulting in the injury.

¶ 12       With his response to the motion, Gaffney included an affidavit asserting that a "dummy" victim was discovered on the second floor of the building while his crew was advancing the hose line. Gaffney and his crew removed the victim and then proceeded to the stairwell to find the source of the fire on the third floor. The hose became entangled in an unseen object on the second floor. Without any visibility, Gaffney crawled and followed the hose line back to a large obstruction that he moved with his left arm. Plaintiff asserted that if he had lost contact with the hose line, "he would have become disoriented in the building and perhaps unable to find his way out." After the smoke cleared from the building, Gaffney discovered that the obstruction was a loveseat.

-4-

¶ 13    A transcript of a tape recording of the board's meeting was also filed. The transcript indicates that Gaffney's attorney stated he was "concerned by the term hearing" because it implied that the Act "permits a District or municipality or anyone to create some sort of factual hearing process subject to the administrative review act." The board's attorney responded, "It does not[,] *** but your concern is noted for the record." Gaffney was then allowed to present evidence. He submitted a copy of the decision awarding a line-of-duty disability pension and reiterated his account of the events leading to his injury. Gaffney also testified about his medical treatment. Gaffney's attorney presented a brief argument in support of the application for section 10 benefits. At the end of the meeting, Gaffney's attorney again addressed the board's attorney, asking, "[T]hen I am not to worry that this is being some sort of formal hearing[.] [T]his is simply an investigatory proceeding for the Board to consider whether to grant him voluntarily or not." The board's attorney responded, "Right. That's exactly the understanding I want you to have."

¶ 14    The trial court ruled that the board's order entered under the process adopted by its ordinance was a final administrative decision subject only to administrative review. Accordingly, the trial court granted the motion to dismiss the declaratory judgment count. As for the remaining count seeking administrative review, the trial court ruled that the Administrative Review Law did not apply because it was not expressly adopted by the Fire Protection District Act (70 ILCS 705/0.01 *et seq.* (West 2006)). The trial court noted that the standard of review under a common law writ of *certiorari* is essentially the same as under the Administrative Review Law. The trial court, therefore, determined that it would treat the request for administrative review as a petition for a common law writ of *certiorari*.

¶ 15    The parties filed briefs addressing whether Gaffney's injury resulted from a response to what he reasonably believed to be an emergency under section 10 of the Act. The trial court determined that the issue was purely a question of statutory construction subject to *de novo* review. The trial court concluded that the plain meaning of the statutory language could not include participation in a training exercise. Thus, as a matter of law, Gaffney could not have reasonably believed he was responding to an emergency given the undisputed facts of this case. The trial court, therefore, affirmed the Board's denial of the application for health insurance benefits.

¶ 16    The appellate court agreed that the Board's decision was subject to review under a common law writ of *certiorari*. Relying on *DeRose v. City of Highland Park*, 386 Ill. App. 3d 658 (2008), the appellate court held that a situation is an "emergency" under section 10 of the Act when it is "urgent and calls for immediate action." The facts established that Gaffney believed he was responding to a training exercise, not an emergency. Gaffney was not entitled to continuing health insurance benefits under section 10 of the Act because he did not reasonably believe he was responding to an emergency. Accordingly, the trial court's judgment was affirmed. *Gaffney*, 397 Ill. App. 3d 679.

¶ 17    Justice Gordon dissented, asserting that the definition of "emergency" focused on a threat demanding immediate attention. Justice Gordon concluded that an emergency developed during the course of the training exercise when the hose became entangled, and Gaffney's injury resulted from his response to that emergency. He concluded that the trial court erred in affirming the board's decision. *Gaffney*, 397 Ill. App. 3d at 691 (Gordon, J., dissenting).

-5-

¶ 18                                        B. No. 110198, Brian J. Lemmenes

¶ 19    Lemmenes filed a one-count complaint for declaratory judgment against the Orland Fire Protection District and the board of trustees of the District, also seeking health insurance benefits under section 10 of the Act. Lemmenes alleged that the defendants had refused his demands to continue payment of his health insurance premiums and he sought an order requiring the defendants to pay those premiums.

¶ 20    The parties filed cross-motions for summary judgment. In support of their motions, the parties relied upon deposition testimony establishing that Lemmenes was a lieutenant with the District. On August 17, 2001, he injured his right knee while testing a fire hose. On September 17, 2002, he reinjured his right knee while participating in a training exercise at an abandoned factory.

¶ 21    During his discovery deposition, Lemmenes testified that he was required to participate in the training exercise and he would have been disciplined if he had refused to take part. The firefighters arrived at the abandoned building in "full turnout gear" with the fire engine's emergency lights activated. Lemmenes testified that the exercise was performed "under emergency circumstances" and the firefighters were instructed by the Mokena fire chief and deputy chief to "respond as if it were an actual emergency." The firefighters were also instructed that "there was a firefighter that was trapped inside of this building, *** he was running out of air, that his personal distress alarm was going off, and that [the firefighters] needed to locate him and rescue him or he would perish." The firefighters were told that the trapped firefighter would actually die if not rescued. Lemmenes testified that "the intent of the drill was to locate and rescue him before his air supply would run out."

¶ 22    Lemmenes injured his knee while "twisting and turning and pulling this individual trying to free him" from an unknown obstacle. Lemmenes removed his bunker pants and observed that he had sustained a large open wound to his knee and it was swollen. He then "went back and did more emergency training at this exercise." Lemmenes was unable to return to full-duty work as a result of his injury and he was subsequently awarded a line-of-duty disability pension.

¶ 23    In his deposition, Howard Stephens testified that he was assistant chief for the Mokena Fire Protection District. He designed the training exercise based on an actual fire that occurred in Phoenix, Arizona, where a Rapid Intervention Team of firefighters was unable to rescue a fellow firefighter from a supermarket fire. Stephens testified that the firefighters arrived in "full turnout gear." There was no live fire during the exercise, but the firefighters' masks were "blacked out" to simulate live fire conditions. The training exercise was timed with a stopwatch. If a firefighter's air supply ran out during the exercise, he or she would stop and take off the mask. Stephens testified that the "trapped" firefighter was not in any real danger during the exercise.

¶ 24    District Battalion Chief Bryant Krizik testified that the firefighters were instructed to advance a hose line into the building along a predetermined path and to rescue a "downed firefighter." The exercise was intended to simulate the supermarket fire that occurred in Phoenix to determine whether there were any techniques that could be used successfully in

that scenario and, if not, to reinforce the firefighters' understanding that the tactics used in Phoenix would not be successful. The exercise was performed under "controlled conditions" and the firefighters knew they were going into a training drill.

¶ 25    The trial court determined that Lemmenes "was actively engaged as if he [were] responding to what could reasonably have been believed to have been an emergency situation because that is what the exercise required of him and he reasonably believed that he was responding to an emergency." The trial court, therefore, concluded that Lemmenes was eligible for health coverage benefits under section 10 of the Act. The trial court granted summary judgment in favor of Lemmenes and denied the defendants' motion for summary judgment.

¶ 26    As in *Gaffney*, the appellate court relied on *DeRose* and determined that an "emergency" occurs when a situation is "urgent and calls for immediate action." The facts presented a situation that was urgent and called for immediate action. The appellate court, therefore, affirmed the trial court's judgment because the injury occurred in response to what Lemmenes reasonably believed to be an emergency. *Lemmenes*, 399 Ill. App. 3d 644.


¶ 27                              II. ANALYSIS
¶ 28                      A. No. 110012, Michael P. Gaffney
¶ 29                          1. *Procedural Issue*
¶ 30    Gaffney first raises a procedural question that must be addressed prior to determining whether the trial court correctly ruled that he was ineligible for section 10 benefits. As noted previously, Gaffney filed a two-count complaint. Count I sought a declaration (see 735 ILCS 5/2-701 (West 2006)) that Gaffney was eligible for section 10 benefits as a matter of law. Count II, pled in the alternative, sought administrative review of defendants' decision denying Gaffney section 10 benefits. The trial court dismissed count I upon defendants' motion and treated count II as a common law writ of *certiorari*. As we detail below, however, the trial court was incorrect in proceeding in this manner.

¶ 31    Gaffney contends that section 20 of the Act prohibits a municipality or political subdivision from enacting any ordinance inconsistent with payment of section 10 benefits. Under section 20, the District did not have authority to decide his claim for continuing health coverage benefits. Gaffney argues his claim should have been decided under the declaratory judgment count of the complaint.

¶ 32    The defendants respond that Gaffney submitted without objection to the District's procedures and the trial court's review by writ of *certiorari*. Further, Gaffney initiated the administrative review process by filing his complaint in the trial court. Accordingly, Gaffney invited any error by taking one position before the District and the trial court and a different position on appeal. The defendants also contend that the board is an agency, the decision denying continuing health coverage benefits is an agency decision, and the common law writ of *certiorari* is the proper means of reviewing the District's decision in this case.

¶ 33    The rule of invited error or acquiescence is a form of procedural default also described as estoppel. *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). The rule prohibits a party

from requesting to proceed in one manner and then contending on appeal that the requested action was error. *People v. Harvey*, 211 Ill. 2d 368, 385 (2004). The rationale for the rule is that it would be manifestly unfair to grant a party relief based on error introduced into the proceedings by that party. *In re Detention of Swope*, 213 Ill. 2d at 217.

¶ 34    The record in this case does not support the defendants' argument that Gaffney acquiesced to the District's procedures. Gaffney's attorney asked twice for clarification on the nature of the board's meeting. Gaffney's attorney initially stated he was "concerned by the term hearing" because it implied that the Act allowed the District to "create some sort of factual hearing process subject to the administrative review act." The board's attorney responded, "It does not[,] *** but your concern is noted for the record." Again, at the end of the meeting Gaffney's attorney asked, "[T]hen I am not to worry that this is being some sort of formal hearing[.] [T]his is simply an investigatory proceeding for the Board to consider whether to grant him voluntarily or not." The board's attorney responded, "Right. That's exactly the understanding I want you to have." The record, therefore, shows that Gaffney raised his procedural concerns before the board. Contrary to the defendants' contentions, Gaffney did not submit without objection to the board acting as an administrative agency in deciding his claim for section 10 benefits.

¶ 35    Gaffney also raised his procedural arguments in the trial court. He filed a complaint seeking declaratory judgment and included a second count for administrative review "in the alternative" and "purely for prophylactic reasons." In his complaint, Gaffney asserted he did not agree or stipulate that the board's decision was subject to review under the Administrative Review Law. He further alleged that the Act does not provide for an administrative hearing or decision, and does not create an administrative agency. When the defendants moved to dismiss the declaratory judgment count contending that the board's decision was a final administrative action, Gaffney argued that the board lacked authority to conduct a hearing or issue a decision on his eligibility for section 10 benefits.

¶ 36    Gaffney did not acquiesce to the dismissal of his declaratory judgment count or the trial court's review by writ of *certiorari*. The record in this case shows that Gaffney has consistently challenged the District's authority to issue an administrative decision on his claim for section 10 benefits. Accordingly, we reject the defendants' argument that Gaffney invited error in this case.

¶ 37    In support of their argument that the board's decision is an agency action, the defendants rely upon sections 1 and 6 of the Fire Protection District Act (70 ILCS 705/1, 6 (West 2006)). The defendants contend those statutory provisions gave them authority to enact the ordinance outlining the procedure for seeking section 10 benefits.

¶ 38    An administrative agency has no general or common law powers. *Alvarado v. Industrial Comm'n*, 216 Ill. 2d 547, 553 (2005). Rather, an agency's powers are limited to those granted by the legislature and any action must be specifically authorized by statute. *Alvarado*, 216 Ill. 2d at 553.

¶ 39    Section 1 of the Fire Protection District Act creates fire protection districts and confers upon those districts a wide range of powers to provide fire protection and prevention. 70 ILCS 705/1 (West 2006). The board of trustees of a fire protection district is given authority

to exercise all powers and control all affairs of the district. 70 ILCS 705/6 (West 2006). The board's powers include providing group life, health, accident, hospital, and medical insurance for the district's employees. 70 ILCS 705/6 (West 2006). The board is also granted the power to pass all necessary ordinances for the proper management and conduct of its business. 70 ILCS 705/6 (West 2006).

¶ 40 The statutory provisions cited by the defendants generally indicate an intent to give fire protection districts the powers necessary to accomplish the objective of providing fire protection and prevention. Districts are given the authority to provide insurance benefits for employees and to control the operation of their insurance programs. A district is, therefore, authorized to provide benefits in employing the workforce necessary to carry out its function.

¶ 41 Those statutory provisions do not express an intent to authorize a district to make administrative decisions on employees' eligibility for section 10 benefits under the Act, however. The Act provides a separate statutory benefit and it is not part of the Fire Protection District Act. See 70 ILCS 705/0.01 *et seq*. (West 2006); 820 ILCS 320/1 *et seq*. (West 2006). The determination of eligibility for this separate statutory benefit under the Act is not subject to a district's authority to manage and control its group insurance program.

¶ 42 The only reference to an administrative action in the Fire Protection District Act is contained in section 16.13b (70 ILCS 705/16.13b (West 2006)). Under that section, a hearing procedure is mandated prior to removal or discharge of a firefighter unless a collective-bargaining agreement requires binding arbitration of disputes involving disciplinary action. 70 ILCS 705/16.13b (West 2006). The hearing procedure set forth in section 16.13b requires written charges and a fair and impartial hearing before the board of fire commissioners. 70 ILCS 705/16.13b (West 2006). The chief of the fire department bears the burden of proving the charges by a preponderance of the evidence. 70 ILCS 705/16.13b (West 2006). Section 16.13b specifically states that a final administrative decision of the board of fire commissioners on removal or discharge is subject to judicial review under the Administrative Review Law. 70 ILCS 705/16.13b (West 2006).

¶ 43 Under section 16.13b, final administrative decisions by the board of fire commissioners are limited to the removal or discharge of a firefighter. The legislature did not express any intention in section 16.13b to give fire protection districts the power to make administrative decisions on eligibility for section 10 benefits under the Act. The Fire Protection District Act does not otherwise refer to administrative decisions or state that a district's decision on any other matter is subject to review under the Administrative Review Law. Our review of the Fire Protection District Act has revealed no provision indicating that the legislature intended the board's denial of section 10 benefits to be an administrative decision subject to administrative review.

¶ 44 The defendants agree that the Act does not create an administrative process for deciding claims for section 10 benefits. The Act does not express or indicate in any way that a decision on eligibility for section 10 benefits may be made by an administrative agency subject only to administrative review. We note that the Act does not provide any guidance on the proper procedure for seeking section 10 benefits. It only mandates that an employer shall provide the benefits if the specified requirements are met. See 820 ILCS 320/10 (West

2006).

¶ 45 Given our review of the relevant statutory provisions, we conclude that the legislature did not express an intent to provide the District with the authority to make administrative decisions on its employees' eligibility for section 10 benefits under the Act. In this case, the board declined Gaffney's request for section 10 benefits after holding a meeting to investigate the factual basis for the request. The board's decision is not an administrative agency action, but is only an employer's objection to paying section 10 benefits. We, therefore, conclude that the trial court erred in dismissing the declaratory judgment count of Gaffney's complaint based on its finding that the board's order was a final administrative decision subject only to administrative review.

¶ 46 Gaffney's declaratory judgment count was the proper means of seeking a determination of section 10 benefits in this case. In the declaratory judgment count of his complaint, Gaffney alleged that the District refused his demand for section 10 benefits in a written "Decision and Order." Gaffney sought a determination of his rights under the Act. He alleged that the defendants' refusal to provide section 10 benefits violated the Act and he sought a determination that he is entitled to those benefits.

¶ 47 The declaratory judgment statute provides that courts may, in cases of actual controversy, make binding declarations of rights, including a determination of the construction of a statute and a declaration of the rights of the interested parties. 735 ILCS 5/2-701(a) (West 2006). Here, the District made a final decision objecting to Gaffney's demand for section 10 benefits. Gaffney seeks a construction of the Act and a declaration of his rights under the statute. This is certainly a case involving an actual controversy and a declaratory judgment would resolve that controversy. See 735 ILCS 5/2-701(a) (West 2006). Accordingly, Gaffney's claim falls squarely within the scope of the declaratory judgment statute.

¶ 48 Although the trial court erred in dismissing count I, we need not remand this matter on that basis alone. We note that after the trial court determined to proceed on the alternative count as a common law writ of *certiorari*, the defendants sought dismissal of that count by arguing that Gaffney was not entitled to benefits under section 10 of the Act. The trial court determined that Gaffney was not entitled to section 10 benefits as a matter of law. The court affirmed the Board's decision and dismissed Gaffney's action in its entirety. We therefore address whether the trial court correctly ruled that Gaffney was ineligible for section 10 benefits as a matter of law.

¶ 49          *2. Section 10 Benefits*

¶ 50 The dispute here focuses on the construction of section 10 of the Act. We must construe section 10 and determine whether the facts alleged by Gaffney fit within the plain meaning of the Act. The construction of a statute presents a question of law also subject to *de novo* review. *In re Andrew B.*, 237 Ill. 2d 340, 348 (2010).

¶ 51 Gaffney contends that the language of the Act does not require an actual emergency, but only a reasonable belief of an emergency. The statutory language does not exclude a training exercise as an emergency situation. He further contends that the Act should be construed liberally to achieve its purpose of conferring benefits upon public safety employees injured

in the line of duty. The circumstances of this case amounted to an "emergency" under the appellate court's decision in *DeRose* because the situation required urgency and immediate action. Gaffney concludes that he is entitled to continuing health coverage benefits under section 10 of the Act because his injury occurred in response to what he reasonably believed to be an emergency.

¶ 52     The defendants contend that the legislature intended a firefighter to be eligible for continuing health coverage benefits under section 10(b) only when one of the four narrow and specific requirements of that section is met. This case does not fit within the meaning of an "emergency" under *DeRose* because the situation was not urgent, it did not call for immediate action, and Gaffney was not facing unforeseen circumstances. Gaffney could not have reasonably believed he was responding to an emergency when he knew and understood that he was participating in a training exercise. Additionally, Gaffney is not entitled to section 10 benefits because he was responding to instructions on participating in a training exercise rather than reacting to a call for assistance. The defendants, therefore, maintain that Gaffney was not "responding" to what he reasonably believed to be an emergency as required to qualify for continuing health coverage benefits under section 10(b).

¶ 53     Section 10 of the Act is entitled "Required health coverage benefits," and provides in pertinent part:

> "(a) An employer who employs a full-time law enforcement, correctional or correctional probation officer, or firefighter, who, on or after the effective date of this Act suffers a catastrophic injury or is killed in the line of duty shall pay the entire premium of the employer's health insurance plan for the injured employee, the injured employee's spouse, and for each dependent child of the injured employee until the child reaches the age of majority or until the end of the calender year in which the child reaches the age of 25 if the child continues to be dependent for support or the child is a full-time or part-time student and is dependent for support. ***

> (b) In order for the law enforcement, correctional or correctional probation officer, firefighter, spouse, or dependent children to be eligible for insurance coverage under this Act, the injury or death must have occurred as the result of the officer's response to fresh pursuit, *the officer or firefighter's response to what is reasonably believed to be an emergency*, an unlawful act perpetrated by another, or during the investigation of a criminal act. Nothing in this Section shall be construed to limit health insurance coverage or pension benefits for which the officer, firefighter, spouse, or dependent children may otherwise be eligible." (Emphasis added.) 820 ILCS 320/10 (West 2006).

¶ 54     The defendants agree that the requirements of subsection (a) have been met in this case. This court has held that a "catastrophic injury" under subsection (a) is synonymous with an injury that results in a line-of-duty disability under section 4-110 of the Illinois Pension Code (40 ILCS 5/4-110 (West 2000)). *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 394 (2003). Gaffney alleged he was awarded a line-of-duty disability pension as a result of his injury. Thus, there is no dispute that Gaffney suffered a catastrophic injury in the line of duty within

the meaning of section 10(a) of the Act.

¶ 55    The point of contention in this case is whether the additional requirements of subsection (b) have been satisfied. Specifically, the issue is whether the facts alleged by Gaffney show his injury occurred in "response to what is reasonably believed to be an emergency," within the meaning of subsection (b).

¶ 56    The fundamental objective of statutory construction is to ascertain and give effect to the intent of the legislature. *Blum v. Koster*, 235 Ill. 2d 21, 29 (2009). The most reliable indicator of legislative intent is the statutory language, given its plain and ordinary meaning. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 216 (2008). When the statutory language is clear and unambiguous, it must be applied as written without resort to extrinsic aids of statutory interpretation. *MidAmerica Bank, FSB v. Charter One Bank, FSB*, 232 Ill. 2d 560, 565 (2009). We will not depart from the plain statutory language by reading into it exceptions, limitations, or conditions that conflict with the expressed intent of the legislature. *MidAmerica Bank, FSB*, 232 Ill. 2d at 565-66.

¶ 57    The plain language of subsection (b) provides that public safety employees will receive section 10 benefits when the injury or death occurs as a result of: (1) a response to fresh pursuit; (2) a response to what is reasonably believed to be an emergency; (3) an unlawful act of another; or (4) the investigation of a criminal act. 820 ILCS 320/10(b) (West 2006). The four factors set forth different types of scenarios encountered by public safety employees. With respect to the factor at issue here, public safety employees are required to respond to emergencies, whether they are real or not. A false fire alarm provokes the same response from firefighters as a real one.

¶ 58    In *DeRose*, our appellate court addressed the construction of section 10(b). *DeRose*, 386 Ill. App. 3d at 660-61. The appellate court observed that the Act does not include a definition of the word "emergency" and, therefore, reviewed dictionary definitions of that term. *DeRose*, 386 Ill. App. 3d at 660-61. The parties directed the appellate court to definitions indicating "emergency" means the "urgent need for assistance or relief," "an unforeseen combination of circumstances that calls for immediate action," and "a sudden condition or state of affairs calling for immediate action." *DeRose*, 386 Ill. App. 3d at 661. The appellate court did not identify the sources of those dictionary definitions, but added its own reference to the primary definition from Webster's Third New International Dictionary, defining "emergency" as " 'an unforeseen combination of circumstances or the resulting state that calls for immediate action.' " *DeRose*, 386 Ill. App. 3d at 661 (quoting Webster's Third New International Dictionary 741 (1993)). Based on those definitions, the appellate court held a situation is an "emergency" under the Act when "it is urgent and calls for immediate action." *DeRose*, 386 Ill. App. 3d at 661.

¶ 59    In this case, the appellate court relied upon the construction of section 10(b) from *DeRose*. See *Gaffney*, 397 Ill. App. 3d at 689. More recently, the appellate court has continued to rely upon *DeRose* in construing the meaning of the term "emergency." *Oskroba v. Village of Hoffman Estates*, 404 Ill. App. 3d 692 (2010); *Lemmenes v. Orland Fire Protection District*, 399 Ill. App. 3d 644 (2010). Thus, following *DeRose*, our appellate court has consistently construed the term "emergency" in section 10(b) of the Act as meaning a

situation that "is urgent and calls for immediate action."

¶ 60    When a statute contains undefined terms, this court has used a dictionary to ascertain the plain and ordinary meaning of those terms. *People v. Davison*, 233 Ill. 2d 30, 40 (2009) (citing *People ex rel. Daley v. Datacom Systems Corp.*, 146 Ill. 2d 1, 15-16 (1991)). The Act does not define the term "emergency" and we, therefore, agree with the appellate court's use of the dictionary definition of that term in its construction of section 10(b).

¶ 61    The primary definition from Webster's Third New International Dictionary states an "emergency" is "an unforeseen combination of circumstances or the resulting state that calls for immediate action <they were far from help when the [emergency] overtook them>." Webster's Third New International Dictionary 741 (1993). As our appellate court has held, an "emergency" clearly requires an urgent and immediate response. The definition also indicates, however, that the urgency or immediate action must result from an unforeseen circumstance. The requirement of an unforeseen event is shown by the illustration stating, "they were far from help when the [emergency] overtook them."

¶ 62    The other senses and illustrations also demonstrate that an unforeseen event is integral to an "emergency." Those senses and illustrations provide: "a : a pressing need : EXIGENCY <a state of [emergency] existed during which any help was acceptable> b : a sudden bodily alteration such as is likely to require immediate medical attention (as a ruptured appendix or surgical shock) c : a usu. distressing event or condition that can often be anticipated or prepared for but seldom exactly foreseen  <an [emergency] water supply> <[emergency] docking facilities> <[emergency] crews working to clear the roads>." Webster's Third New International Dictionary 741 (1993). While we agree with the appellate court that an "emergency" includes an element of urgency and the need for immediate action, we also believe it involves an unforeseen circumstance or event requiring that immediate action.

¶ 63    Further, section 10(b) covers situations arising in the performance of a public safety employee's job. The four factors from section 10(b) involve potentially dangerous situations occurring in the course of employment. A firefighter's employment includes responding to situations involving imminent danger to a person or property. The term "emergency" in section 10(b), as applied to a firefighter, connotes the sense that either a person or property is in some form of imminent danger.

¶ 64    We, therefore, conclude that the plain and ordinary meaning of the term "emergency" in section 10(b) is an unforeseen circumstance involving imminent danger to a person or property requiring an urgent response. To be entitled to continuing health coverage benefits under section 10(b), the injury must occur in response to what is reasonably believed to be an unforeseen circumstance involving imminent danger to a person or property requiring an urgent response.

¶ 65    Gaffney's crew was given instructions on how to proceed prior to the exercise. However, the allegations show that an unforeseen circumstance arose after the exercise began. As the firefighters were advancing up the stairwell to the third floor, the hose line became entangled in an unseen object. The entanglement of the hose in the unseen object is certainly an unforeseen circumstance. The response to this event was also unforeseen. Gaffney was

required to follow the hose line back to the obstruction and free the hose with no visibility and the risk of becoming disoriented in the smoke-filled building.

¶ 66 The unforeseen conditions alleged by Gaffney involved imminent danger to a person or property requiring an urgent response. The tangled hose line called for an urgent response because the crew was stranded on the stairwell to the third floor of the burning building with no visibility and no water to put out the fire. In those minutes, the training exercise turned into an emergency.

¶ 67 Any fire, even one set in a training exercise, carries the potential for a life-threatening situation. No matter how many safety precautions are taken, there is always a chance that a person may be injured or even killed in these circumstances. Here, Gaffney's injury occurred in response to something that went wrong in the training exercise, turning it into an emergency. In freeing the hose line from the obstruction, Gaffney put himself at risk of becoming lost and disoriented in the smoke-filled building. Importantly, Gaffney did not have the option of ending his participation in the exercise after it became an emergency.

¶ 68 If the General Assembly intended to limit an "emergency" only to those events representing an actual or real threat to the public, it would not have added the modifying language "reasonably believed" to the phrase. Further, the use of the word "emergency" in this context suggests an intent to cover dangerous situations arising in a firefighter's employment. It is the unforseen nature of emergencies in general that supports such a construction. Emergencies, particularly those involving fire or explosions, can arise in a number of unexpected places and firefighters are expected to respond to them. An emergency can arise during a training exercise, especially one involving a live fire.

¶ 69 In this case, Gaffney's belief that he was responding to an emergency during the training exercise was reasonable and falls within the purview of the Act. Accordingly, the trial court's judgment in favor of the defendants on the issue of section 10 eligibility must be reversed and the cause remanded to the trial court for further proceedings consistent with this opinion on the declaratory judgment count of Gaffney's complaint.

¶ 70                    B. No. 110198, Brian J. Lemmenes

¶ 71 Lemmenes contends that the circumstances of his case amounted to an "emergency" because they required urgency and immediate action. He maintains that he is entitled to health coverage benefits under section 10(b) of the Act because his injury occurred in response to what he reasonably believed to be an emergency.

¶ 72 The defendants contend that this case does not fit within the meaning of an "emergency" because the situation was not urgent, it did not call for immediate action, and Lemmenes was not facing unforeseen circumstances. The defendants argue that Lemmenes was not responding to what he reasonably believed to be an emergency, as required to qualify for health coverage benefits under section 10(b).

¶ 73 In this case, the parties filed cross-motions for summary judgment on Lemmenes' declaratory judgment action. Summary judgment is appropriate when the pleadings, depositions, and admissions on file, along with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735

-14-

ILCS 5/2-1005(c) (West 2006). By filing cross-motions for summary judgment, the parties agree that no factual issues exist and this case turns solely on legal issues subject to *de novo* review. *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 432 (2010).

¶ 74    Here, Lemmenes was required to participate in a training exercise simulating an actual supermarket fire. The firefighters were instructed to advance a hose line into an abandoned building following a predetermined path and to rescue a "downed firefighter." The firefighters' masks were "blacked out" to simulate live fire conditions, but there was no live fire during the exercise. The training exercise was timed with a stopwatch. If a firefighter's air supply ran out, he or she would stop participating and take off the mask.

¶ 75    Prior to the exercise, the firefighters were instructed to "respond as if it were an actual emergency" and that "there was a firefighter that was trapped inside of this building, *** he was running out of air, that his personal distress alarm was going off, and that [the firefighters] needed to locate him and rescue him or he would perish." The "downed firefighter" was not in any real danger, however, and the exercise was performed under "controlled conditions."

¶ 76    The firefighters arrived at the abandoned building in "full turnout gear" with the fire engine's emergency lights activated. During the exercise, Lemmenes injured his knee while "twisting and turning and pulling this individual trying to free him" from an unknown obstacle. After injuring his knee, Lemmenes removed his bunker pants and observed a large open wound. He then "went back and did more emergency training at this exercise."

¶ 77    The facts in this case do not establish any unforeseen circumstance involving imminent danger to a person or property requiring an urgent response. Lemmenes understood that he was participating in a training exercise despite the efforts to simulate an emergency situation and the orders to react as if it were an actual emergency. The firefighters were instructed to advance a hose line into the building along a predetermined path and were given specific instructions for performing the exercise. The training exercise was conducted under planned, "controlled conditions." No unexpected or unforeseen developments arose during this drill, unlike the situation in *Gaffney* where the hose line became entangled in an unknown object.

¶ 78    Further, the training exercise did not involve a live fire nor was there any smoke in the structure. Instead, the firefighters' masks were "blacked out" to simulate live fire conditions. No one was in imminent danger during the exercise, including the "downed firefighter."

¶ 79    The evidence in this case does not support a finding that Lemmenes was injured while making an urgent response to an unforeseen circumstance involving imminent danger to a person or property. Rather, he was injured during a training exercise that proceeded as planned without any unforeseen developments. The circumstances of this case do not satisfy the requirements of section 10(b) of the Act. The trial court erred in granting summary judgment in favor of Lemmenes on his declaratory judgment claim and in denying the defendants' motion for summary judgment. We must, therefore, reverse the appellate court's judgment affirming the judgment of the trial court.

¶ 80                                    III. CONCLUSION

¶ 81    We conclude that the trial court erred in dismissing Gaffney's complaint for declaratory

judgment and the appellate court erred in affirming that judgment. Accordingly, we reverse the circuit and appellate court judgments in *Gaffney* and remand the cause to the circuit court for further proceedings consistent with this opinion on Gaffney's complaint seeking a declaratory judgment. In *Lemmenes*, we reverse the appellate court's judgment.

¶ 82    No. 110012—Judgments reversed; cause remanded.

¶ 83    No. 110198—Appellate court judgment reversed.

¶ 84    JUSTICE GARMAN, concurring in part and dissenting in part:

¶ 85    The majority concludes that given the plain meaning of the word "emergency" in section 10(b) of the Public Safety Employee Benefits Act (820 ILCS 320/10(b) (West 2006)), plaintiff Michael Gaffney is entitled to continuing health coverage benefits for himself and his family while plaintiff Brian Lemmenes is not. In my opinion, the majority's interpretation of section 10(b) of the Act is not consistent with our responsibility to give effect to the intent of the legislature. In addition, the manner in which the majority applies its interpretation of the statute to the facts of the two claims obscures the distinction between an injury sustained in the line of duty and a line-of-duty injury occurring "as the result of the *** firefighter's response to what is reasonably believed to be an emergency." *Id.* As a result, the court's opinion does not provide clear guidance for future cases. Thus, although I agree with the result reached by the majority with respect to Lemmenes's claim, I dissent from the portion of the opinion interpreting section 10(b) and from the majority's conclusion regarding Gaffney's claim.

¶ 86                              Statutory Interpretation

¶ 87    Section 10(a) of the Act provides that the employer of a full-time public safety employee who "suffers a catastrophic injury or is killed in the line of duty" must pay the entire health insurance premium for the employee, his or her spouse, and his or her dependent children. 820 ILCS 302/10(a) (West 2006). Not all catastrophic or fatal line-of-duty injuries, however, qualify for these additional benefits. Under section 10(b) of the Act:

> "In order for the law enforcement, correctional or correctional probation officer, firefighter, spouse, or dependent children to be eligible for insurance coverage under this Act, the injury or death must have occurred as the result of the officer's response to fresh pursuit, the officer or firefighter's response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act. Nothing in this Section shall be construed to limit health insurance coverage or pension benefits for which the officer, firefighter, spouse, or dependent children may otherwise be eligible." 820 ILCS 320/10(b) (West 2006).

¶ 88    The operative language in the present case is the phrase "the firefighter's response to what is reasonably believed to be an emergency." The term "emergency" is not defined in the statute.

-16-

¶ 89    Relying on a dictionary definition, the majority holds that an "emergency" is an "unforeseen circumstance involving imminent danger to a person or property requiring an urgent response." *Supra* ¶ 64. Thus, according to the majority, for a firefighter to be entitled to the benefits at issue, his injury must have occurred "in response to" something he reasonably believed to be "an unforeseen circumstance involving imminent danger to a person or property requiring an urgent response." *Supra* ¶ 64.

¶ 90    In reaching this conclusion, the majority rejects the interpretation of the statutory term "emergency" that was adopted by the appellate court in *DeRose v. City of Highland Park*, 386 Ill. App. 3d 658, 661 (2008), and applied by the appellate court in the present case. In *DeRose*, the appellate court noted that three different dictionaries provided three similar, but not identical, definitions of the term. *Id.* The common denominator in all of the definitions was that an emergency is a situation that is "urgent" and that "calls for immediate action." The *DeRose* court also quoted the definition referenced by the majority, which contains the words "an unforeseen combination of circumstances," but did not adopt this language as part of its interpretation of the statute. *Id.*

¶ 91    The majority concludes that an "emergency," as that term is used in section 10(b), is a circumstance that "clearly requires an urgent and immediate response." *Supra* ¶ 61. I agree.

¶ 92    However, the majority then goes on to say that the "definition also indicates, however, that the urgency or immediate action must result from an unforeseen circumstance." *Supra* ¶ 61. In effect, the majority grafts the entire definition of "emergency" from one specific dictionary onto the statute, treating the words of Webster's Third New International Dictionary as if they were the words of the legislature. This mechanical approach to statutory interpretation treats the words chosen by the editors of a dictionary as if they were the words of the statute itself and creates a new statutory requirement that was not intended by the legislature—a requirement that may have far-reaching effects in future cases.

¶ 93    Nothing in section 10(b) suggests that a circumstance to which a firefighter is responding must have been "unforeseen" to qualify as an emergency. Indeed, the majority's creation of this requirement raises more questions than it answers. Exactly what circumstance must have been unforeseen—the overall situation to which the firefighter was responding or the particular cause of the injury to the firefighter? And whose perspective is examined—the injured firefighter, his supervisor, or the objective reasonable person? When is the fact of whether the circumstance was foreseen to be assessed—when the alarm sounds causing the fire department to respond or when the firefighter encounters the person or object that causes the injury? Further, if the statute is interpreted to require that the circumstance creating the emergency have been unforeseen by the injured firefighter, it not only penalizes the individual who did foresee danger but responded anyway but also rewards the individual who failed to see a foreseeable danger.

¶ 94    In my opinion, the appellate court in *DeRose* and in the present case properly interpreted the statutory term "emergency" as a circumstance requiring urgent and immediate action. The majority's requirement that the emergency circumstance must have been unforeseen is not essential to the legislature's intent. The statute was not intended to provide additional benefits to any firefighter who is accidentally injured on the job, but only to those whose

injuries occurred as they were responding to a circumstance they reasonably believed to require urgent and immediate action. Requiring that the circumstance have been "unforeseen" could result in the denial of benefits to a firefighter whose injury or death occurred under circumstances of true emergency, but one that was foreseen, merely because this court unjustifiably created a judicially imposed requirement not intended by the legislature. As this court has said on numerous occasions, "[w]e may not add exceptions, limitations, or conditions to statutes in derogation of their plain meaning." *Holly v. Montes*, 231 Ill. 2d 153, 159 (2008). See also *People ex rel. Department of Professional Regulation v. Manos*, 202 Ill. 2d 563, 568 (2002); *Lauer v. American Family Life Insurance Co.*, 199 Ill. 2d 384, 390 (2002).

¶ 95     In addition, although it is entirely appropriate for a court to rely on a dictionary definition to reveal the plain, ordinary, and popularly understood meaning of an undefined statutory term (*People v. Perry*, 224 Ill. 2d 312, 330 (2007)), a dictionary may contain more than one definition for the same term and different dictionaries may contain different, although similar, definitions. It is the responsibility of the court when utilizing a dictionary to choose that definition that most effectively conveys the intent of the legislature:

> "Our primary objective is to ascertain and give effect to legislative intent, the surest and most reliable indicator of which is the statutory language itself, given its plain and ordinary meaning. [Citation.] In determining the plain meaning of statutory terms, we consider the statute in its entirety, keeping in mind the subject it addresses and the apparent intent of the legislature in enacting it. [Citation.] Where the language of the statute is clear and unambiguous, we must apply it as written, without resort to extrinsic aids to statutory construction." *Id.* at 323.

¶ 96     While reference to one particular dictionary definition of "emergency" may provide some insight into the plain and ordinary meaning of the word, it does not take into account the entire statute or the intent of the legislature. For example, the dictionary definition that the majority would graft onto the statute also requires that the circumstance involve imminent danger to a person or property, but it does not enlighten us as to what persons or whose property must be in danger. For this, we must look more closely at section 10(b) and the entire statutory scheme governing officers' and firefighters' benefits.

¶ 97     To qualify for the benefits provided by this statute, the injury or death of the officer or firefighter must be the result of one of four circumstances listed in section 10(b): (1) fresh pursuit, (2) the individual's response to what he reasonably believes to be an emergency, (3) an unlawful act perpetrated by another, or (4) investigation of a criminal act. If we are to give effect to the intent of the legislature, we must read the second of these four circumstances in a manner consistent with the other three, which describe situations encountered by police officers and firefighters in the course of their actual duties as they protect and serve the public.

¶ 98     An officer who is injured while driving a squad car on a training course while practicing techniques of fresh pursuit is not in fresh pursuit. An officer who is injured while training in techniques of subduing a suspect is not injured by the unlawful act of another when the individual playing the role of suspect resists arrest. An officer who is injured while engaging

in a training exercise involving investigation of a staged crime scene is not injured while investigating a crime. No matter how realistic such training exercises may be, or how seriously the participants take their instructions to treat the training scenarios is if they are real, any injuries that occur do not come within the scope of section 10(b) because the participants are not actually involved in one of the enumerated circumstances. Similarly, firefighters participating in a training exercise do not *actually* believe they are responding to a circumstance that involves imminent danger to another person or to property.

¶ 99    Thus, when read in context of section 10(b) as a whole, what an officer or firefighter "reasonably believes to be an emergency" refers to a situation to which he is called upon to respond in the course of carrying out his professional duties. To be entitled to benefits under section 10(a), the firefighter must have been responding as a firefighter, not as a participant in a training exercise, to what he reasonably and actually believed to be an emergency in which there was imminent danger of harm to another person or to property. If his reasonable and actual belief turns out to have been incorrect, as in the case of a false alarm, he would still be entitled to section 10(a) benefits if he were injured while responding.

¶ 100    The larger context of the entire legislative scheme regarding firefighter's benefits supports this reading. A firefighter who is catastrophically injured is entitled to a line-of-duty disability pension under the Illinois Pension Code. 40 ILCS 5/4-110 (West 2006). In addition, he is entitled under the Insurance Code to maintain health insurance coverage for himself, his spouse, and his dependents under the prevailing group rate. 215 ILCS 5/367f (West 2006). Section 10(b) is designed to provide additional benefits to a limited subset of firefighters who are injured in the line of duty.

¶ 101    The definition adopted by the majority, however, would encompass nearly every line-of-duty injury so long as the circumstance that led to the injury was "unforeseen." In effect, the majority has equated an emergency within the meaning of section 10(b) with a mere accident. According to the same dictionary utilized by the majority, an accident is "an event or condition occurring by chance or arising from unknown or remote causes" or "an unforeseen unplanned event or condition." Webster's Third New International Dictionary 11 (1993). An accident is also a "sudden event or change occurring without intent or volition through carelessness, ignorance, or a combination of causes and producing an unfortunate result." *Id.* The majority grafts this requirement onto the statutory language even though an unforeseen emergency does not necessarily present a greater risk to a firefighter than a foreseen emergency. The legislature made no distinction between unforeseen emergencies and foreseen emergencies. As a result, the additional benefits of section 10(a) should not be available in one circumstance but not the other.

¶ 102    Consider a workplace injury that occurs in the fire station. A piece of equipment falls and the firefighter leaps out of the way to avoid being hit, falling and fracturing his leg. He is responding to an unforeseen circumstance that involves imminent danger to himself and that requires the urgent response of a sudden movement to avoid injury. If the fracture is a career-ending injury, he would be entitled to section 10(a) benefits under the majority's rule. However, under my reading of the statute, this accident would not qualify as an emergency because he could not have reasonably and actually believed that his response as a professional firefighter was necessary to protect another person or property from imminent

-19-

danger of harm from the falling equipment.

¶ 103    In contrast, firefighters could be called to stand by while a controlled burn of a wooded area is undertaken. The possibility that the flames could spread is foreseen by everyone involved. Yet, under the majority's rule, if a firefighter suffers a catastrophic injury responding to the spread of the flames outside the intended area, he would not be eligible for section 10(a) benefits because the circumstance was not unforeseen and, therefore, was not an emergency.

¶ 104    For these reasons, I dissent from the majority's interpretation of section 10(b), which will result in the granting of additional benefits to some injured firefighters and the denial of additional benefits to others, and, in both cases, will thwart the will of the legislature.

¶ 105                    Application of the Rule to the Facts

¶ 106    Both Gaffney and Lemmenes were responding to circumstances they encountered during training exercises. Both were instructed to perform their duties during the exercises as if they were responding to true emergencies. By definition, both knew that there was no real emergency.

¶ 107    Lemmenes was injured when he tried to pull a "downed firefighter" from an "unknown obstacle" under circumstances that were created to "simulate" an emergency. *Supra* ¶¶ 75-77. Under the majority's rule that the circumstance creating the emergency must have been "unforeseen," Lemmenes is not entitled to additional benefits under section 10(b) of the Act because he "understood that he was participating in a training exercise" in which the participating firefighters were "instructed to advance a hose line into the building along a predetermined path and were given specific instructions for performing the exercise." *Supra* ¶ 77. Thus, the need to lift or move an unknown obstacle was not, according to the majority, unforeseen.

¶ 108    As for Gaffney, the majority states that "an unforeseen circumstance arose after the exercise began." *Supra* ¶ 65. Gaffney's progress was halted by the entanglement of his hose with a piece of furniture, which the majority states was "certainly an unforeseen circumstance." *Supra* ¶ 65.

¶ 109    Comparing the two cases, the majority concludes that "[n]o unexpected or unforeseen developments arose" during the *Lemmenes* drill, "unlike the situation in *Gaffney* where the hose line became entangled in an unknown object." *Supra* ¶ 77. According to the majority, the "unknown" piece of furniture that became entangled with Gaffney's hose line was an "unforeseen development"—even though it was placed in the structure, along the route of the hose line, by the designers of the exercise—but the "unknown obstacle" complicating the rescue of the downed firefighter in *Lemmenes* was not unforeseen. Yet on this requirement of the majority's test, the facts of *Gaffney* and *Lemmenes* are almost identical.

¶ 110    In my opinion, section 10(b) does not require that the emergency being responded to be unforeseen or unforeseeable. However, if such a requirement is to be applied, neither the entanglement of Gaffney's hose line nor Lemmenes's need to pull a downed firefighter to safety were unforeseen by either the trainers who designed the scenarios or the trainees, who were instructed that they were to enter a furnished structure and rescue anyone inside. These

-20-

were precisely the types of occurrences that firefighters expect to encounter in a real fire and for which the training exercises were designed to prepare them.

¶ 111    Gaffney was undoubtedly aware that such situations could arise during the exercise. He argues, however, that he was "never advised as to the shape, location or identity of the various obstacles he would encounter," as if an effective training exercise would involve entirely predictable and expected circumstances. Gaffney and the majority overlook the fact that furniture and dummy "victims" are placed in training scenarios for the purpose of training firefighters to navigate through unfamiliar furnished structures and to rescue trapped individuals. In Gaffney's case, the fact that a hose could become tangled in a piece of furniture was just as foreseen as the obstacle encountered by Lemmenes.

¶ 112    The majority also states that Gaffney's "response to this event was also unforeseen." *Supra* ¶ 65. This adds an entirely new element to the test that the majority purports to adopt. Not only must the circumstance to which the firefighter is responding be unforeseen, the nature of his response must also be unforeseen. But why? What purpose of the statute is advanced by limiting an emergency to a situation in which the firefighter's response is unforeseen? And by whom? The majority does not say.

¶ 113    In any event, Gaffney's response to the entanglement of his hose line was not unforeseen. He responded to a condition of the training exercise precisely as he was trained to respond—he followed his hose line back to the obstruction. He then cleared the obstruction by moving a piece of heavy furniture.

¶ 114    Nor was Gaffney's lack of visibility unforeseen (*supra* ¶ 66), despite the majority's focus on this fact. Lack of visibility was part of the design of both training exercises, although one involved actual smoke produced by a live fire and one involved the simulation of smoke by blacking out the trainees' masks.

¶ 115    The majority also notes that Gaffney could have become lost or disoriented had he lost contact with the hose. But he did not become lost or disoriented. Nothing in the language of section 10(b) suggests that a circumstance is an emergency if it might have become dangerous under hypothetical facts.

¶ 116    In the end, the majority concludes that these "unforeseen conditions alleged by Gaffney involved imminent danger to a person or property requiring an urgent response." *Supra* ¶ 66. As stated above, I do not agree that section 10(b) requires that the emergency have been unforeseen or unforeseeable, but if this is a requirement of the statute, neither Lemmenes nor Gaffney meets this requirement.

¶ 117    Section 10(b) also requires that the injured firefighter have reasonably believed that he was responding to an emergency. In both of these cases, however, the firefighters were fully aware that they were participating in training exercises that required them to act as if they were true emergencies. An analogy to war games is helpful. In a war game, service members are instructed to treat the game as if it were a real battle or other military mission. In some training scenarios, live ammunition may be used. Nevertheless, the participants understand that they are not at war. Similarly, both Lemmenes and Gaffney understood that they were roleplaying and that no one's home or business was in danger of destruction by fire and no one inside either structure was in danger of death or injury if he or she could not escape.

-21-

¶ 118    As to the requirement of imminent danger to person or property, the majority states that because other firefighters were on the upper floor waiting for the arrival of Gaffney's hose, "there [was] a chance that a person may [have been] injured or even killed." *Supra* ¶ 67. Under the majority's own rule, however, the mere chance of injury is not sufficient; there must be imminent danger. Further, the record reveals that after he injured his shoulder, Gaffney turned and followed the hose line back and then climbed up to the third floor. When he reached the third floor, one of the officers inside the building noticed that he was in pain and having difficulty breathing. The officer immediately called a halt to the drill. This fact contradicts the majority's statement that "the crew was stranded on the stairwell to the third floor of the burning building with no visibility and no water to put out the fire," thus turning the training exercise into an emergency. *Supra* ¶ 66.

¶ 119    Although one can imagine circumstances that might turn a training exercise into an emergency, this is not such a case. No person and no property were in imminent danger of harm at the time Gaffney used his left arm to move a piece of furniture to free his tangled hose. Shortly thereafter, the entire exercise was terminated. Nothing in the record suggests that the other participants in the training exercise were ever in any danger or that they had any difficulty exiting the structure when the exercise was called off. In short, there was no imminent danger, merely the remote potential for danger arising from circumstances that never actually materialized.

¶ 120    The final requirement applied by the majority is that the unforeseen circumstance that places a person or property in danger must require an urgent response. This requirement is met, the majority finds, by the fact that "[a]ny fire, even one set in a training exercise, carries the potential for a life-threatening situation." *Supra* ¶ 67. In such circumstances, there is "a chance that a person may be injured or even killed." *Supra* ¶ 67. Gaffney qualifies for section 10(a) benefits, according to the majority, because of a "chance that a person may be injured or even killed in these circumstances." *Supra* ¶ 67. In Lemmenes's case, on the other hand, there was no live fire, only a simulated fire, and he faced no "real danger" because the exercise was being performed "under 'controlled conditions.' " *Supra* ¶ 75.

¶ 121    Even if I accept, for the sake of argument, that a training exercise could evolve into an emergency, the majority's application of its rule to the facts of the two cases creates a "live fire rule" under which virtually any serious injury sustained by a firefighter during a live fire training exercise, regardless of the cause, will qualify for benefits under section 10(b) because of the mere "potential" that the live fire could cause injury or death. This is surely not what the legislature intended when it enacted the statute.

¶ 122    I, therefore, dissent from the majority's conclusion regarding Gaffney's claim for additional benefits under section 10(a) of the Act.


¶ 123                              Conclusion

¶ 124    In sum, I agree with the majority that there is no ambiguity in the statute and that plain meaning principles apply. However, the majority's plain meaning analysis is incomplete because it does not take into account the statute in its entirety and the clear legislative intent. In addition, the majority treats the dictionary definition as if it were the enacted statutory

language without critical analysis to determine whether it is consistent with the statutory intent. I, therefore, dissent from the portion of the majority opinion interpreting the term "emergency" in section 10(b). In my opinion, section 10(b) grants additional benefits only when the firefighter is catastrophically injured or killed while responding in his professional capacity to a circumstance that he reasonably believes poses imminent danger to another person or property and that requires an urgent response.

¶ 125    I also respectfully dissent from the portion of the opinion applying the newly interpreted statute to the facts of Gaffney's case. Under the statute as I read it, both Gaffney and Lemmenes suffered accidental, career-ending, line-of-duty injuries, but neither occurrence resulted from a response to what the firefighter reasonably believed to be an emergency because neither was responding as a firefighter to a circumstance that placed another person or property in imminent danger. Not only does the majority reach the wrong result with regard to Gaffney's claim, in doing so, it creates a rule that would encompass all catastrophic injuries sustained during live-fire training.

¶ 126    Firefighters know all too well that not all emergencies are accidents. Arson is an emergency, not an accident. Similarly, as illustrated by the present cases, not all accidents are emergencies. Both Gaffney and Lemmenes suffered career-ending accidental injuries in the line of duty and are entitled to pension and other benefits as a result, in addition to our respect and gratitude for their service. They are not, however, eligible for the additional benefits provided by section 10(a) of the Act to those who are catastrophically injured or killed under certain limited circumstances listed in section 10(b).


¶ 127    JUSTICES THOMAS and KARMEIER join in this partial concurrence and partial dissent.