2020 IL App (3d) 190267

Opinion filed November 20, 2020

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| JACOB P. PITTS, | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| Plaintiff-Appellant, | ) | Kankakee County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-19-0267 |
| | ) | Circuit No. 19-MR-88 |
| CHAD KOLITWENZEW, Director, | ) | |
| Jerome Combs Detention Center, | ) | The Honorable |
| | ) | Ronald J. Gerts, |
| Defendant-Appellee. | ) | Judge, presiding. |

JUSTICE CARTER delivered the judgment of the court, with opinion.
Presiding Justice Lytton and Justice Schmidt concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiff, Jacob P. Pitts, a pretrial detainee in the Kankakee County jail (also known as the

Jerome Combs Detention Center), filed a *mandamus* complaint in the trial court seeking to

compel defendant, Chad Kolitwenzew, the director of the jail (Director), to provide Pitts with

barber services and access to a sufficient law library and to stop restricting Pitts's access to

correspondence and legal materials as a disciplinary sanction.[1] After an evidentiary hearing, the

_____

        [1]Although Pitts labeled his pleading a petition for writ of *mandamus*, the pleading is more
properly referred to as a complaint for *mandamus* relief. See 735 ILCS 5/2-1501 (West 2018) (abolishing
writs); *id.* § 14-102 (referring to the filing of a complaint for *mandamus*); *Turner-El v. West*, 349 Ill. App.
3d 475, 477 (2004); *People ex rel. Braver v. Washington*, 311 Ill. App. 3d 179, 181 n.1 (1999).

trial court denied Pitts's complaint for *mandamus* relief. Pitts appeals. We affirm the trial court's judgment.

¶ 2                                    I. BACKGROUND

¶ 3        In March 2019, while Pitts was a pretrial detainee in the county jail awaiting trial on certain charges, he filed a *pro se* complaint for *mandamus* relief against the Director. In his complaint, Pitts alleged, among other things, that on certain specified dates (1) his correspondence and legal materials had been taken away from him (or he was denied access to those items) as disciplinary punishment, (2) he was denied barber services at the jail, and (3) he had been denied sufficient legal materials or resources at the jail. Pitts sought to have the trial court order the Director to provide him with access to barber services and a sufficient law library that complied with part 701 of the Title 20 of the Illinois Administrative Code (County Jail Standards) (see 20 Ill. Adm. Code 701) and to prohibit correctional officers from denying Pitts access to his correspondence and legal materials in the future. The Director filed an answer to the *mandamus* complaint and denied Pitts's main accusations.

¶ 4        Later that same month, the trial court held an evidentiary hearing on the *mandamus* complaint. Pitts was present in court for the hearing, in the custody of the county sheriff, and represented himself *pro se*. Pitts was allegedly in shackles, although there is no mention of that in the record, except for one brief reference that Pitts made in passing during his testimony. Pitts did not ask to have the shackles removed and did not object to being restrained.

¶ 5        The Director was also present in court for the hearing and was represented by one of the county's assistant state's attorneys (referred to hereinafter as the Director's attorney). At or near the start of the hearing, the Director's attorney asked the trial court whether the hearing could be conducted "a little more informally" so that she could conduct her direct examination of the

2

Director immediately after Pitts had done so rather than having to wait until the Director's case-in-chief. The trial court allowed the Director's attorney's request.

¶ 6        During the evidence portion of the hearing, the trial court heard the testimony of both the Director and Pitts. In addition, the trial court admitted two jail videos as exhibits for Pitts and also admitted a copy of the County Jail Standards as an exhibit for the Director. The evidence that was presented can be summarized as follows.

¶ 7        The Director testified that he had been the chief of corrections at the county jail for the past six or seven years and, prior to that time, had been the assistant chief of corrections at the jail for about four years. One of the Director's responsibilities as the chief of corrections was to ensure that the jail was a safe environment for the jail's employees and inmates. In keeping with that responsibility, the Director enacted disciplinary consequences based on incidents that happened in the jail and in line with the County Jail Standards.

¶ 8        Pitts was currently an inmate at the jail and was awaiting trial for pending Kankakee County criminal charges. In 2012, Pitts was convicted of attempting to escape from the jail. While Pitts was an inmate at the jail (presumably in relation to the current offenses), he was involved in various incidents. According to the Director, Pitts had assaulted and battered other inmates, had assaulted and battered corrections staff, had deployed a taser against one of the correctional officers, and had smeared and used fecal matter within the facility. As a result of those incidents, disciplinary action was taken against Pitts. In the Director's opinion, Pitts was a security risk to the safety of the jail employees and other inmates.

¶ 9        At the time of the hearing, Pitts was being housed in "Max C" as a disciplinary sanction for when Pitts deployed a taser on a member of the corrections staff. Max C was a disciplinary segregation/restrictive housing unit at the jail. While in Max C, Pitts was only allowed to be out

3

of his cell for one hour each day to use the phone, take a shower, clean his cell, and do whatever else he needed to do. When the Director was asked during his testimony if there was a reason why the corrections staff would take an inmate's personal property if a disciplinary action had occurred, the Director responded that if the conduct had occurred inside the cell, the corrections staff would remove items to make sure the cell was clean and that everything was in order before they gave the items back to the inmate. In addition, because Max C was disciplinary housing, less property was permitted in the cell. An inmate in Max C was not allowed to accumulate commissary and could not take with him into Max C any items that he had bought from the store. Items that were needed as part of everyday life, however, such as legal work, were allowed in the cells in Max C.

¶ 10        More specifically as to Pitts's accusations, the Director testified that the jail did not have a barber shop or an area where inmates went to get their hair cut. Instead, the jail provided inmates with barbering tools—hair trimmers, clippers, shavers, and plastic guards that controlled the length at which the hair was cut—so that the inmates could cut their own hair or cut each other's hair. Pitts had requested to be seen by a barber or to have barber services at various times while he was in jail and had been provided with the barbering tools by the jail staff. As for Pitts's mail, the Director testified that Pitts was given his correspondence when it was received at the jail, after it had been screened, and that the mail screening procedures were enacted pursuant to the County Jail Standards. According to the Director, the jail did not withhold mail from an inmate as a disciplinary sanction. With regard to Pitts's access to legal materials, the Director testified that the jail had wall kiosks located throughout the facility that contained all of the different legal resources that were available to the inmates. The jail also had law libraries that were located on carts or in attorney rooms in the different housing units for the inmates to use.

4

To the best of the Director's knowledge, the different legal resources available to the inmates were those that were required by the County Jail Standards. The Director denied that he had withheld legal resources from Pitts for disciplinary reasons and stated that legal resources were available to Pitts, even when he was being housed in Max C.

¶ 11        Pitts testified that he arrived at the jail in April 2018. In May 2018, it was alleged that Pitts had been involved in an aggravated battery to some of the correctional officers. According to Pitts, as a form of disciplinary punishment, his legal materials and all his other property items, even hygiene items, were taken away from him. Pitts was left in a cell with nothing other than a blanket and a sheet for about six weeks. In November 2018, Pitts was charged with another aggravated battery of a correctional officer, and his legal materials and other property items were again taken away from him for a period of time. In June 2019, Pitts was alleged to have committed a third aggravated battery of a correctional officer (the incident where Pitts allegedly deployed a taser on the officer) and was again denied access to his property and legal materials.

¶ 12        Pitts indicated during the hearing that he did not have an issue with the mail procedure at the county jail. Rather, according to Pitts, his complaint was about his correspondence materials—his pen and paper—being taken at times. As for barbering services, Pitts acknowledged during his testimony that he had been provided with barbering tools when he requested them but complained that other inmates had stolen all of the plastic trimmer guards so that the only option available to him was to shave off all of his hair. In addition, although Pitts had seen inmates cutting each other's hair in the general population at the jail, that did not occur in Max C because Max C was a segregation unit and the inmates in the unit were not allowed to have contact with each other.

¶ 13          With regard to legal resources, Pitts testified that other inmates in disciplinary segregation had access to the wall kiosks, which had all of the legal resources on them that were required by the County Jail Standards. Pitts, however, was not allowed in the area where the wall kiosks were located. According to Pitts, when he was taken out of his segregation cell for his daily hour of recreation, he was taken to the booking area. There was no wall kiosk in that area. Instead, the booking area had a cart with a computer on it that contained certain Illinois legal resources. Pitts did not believe, though, that the legal resources on the computer were up to date and was unable to find jury instructions on the computer.

¶ 14          After the presentation of the evidence had concluded, the trial court took the case under advisement. The following month, in April 2019, the trial court issued its written decision, denying Pitts's complaint for *mandamus* relief. In its ruling, the trial court found that (1) the restrictions on barber services in the maximum-security unit were reasonable and within necessary security measures allowed by the applicable regulations, (2) the problem with the plastic trimmer guards was not of the Director's making, and (3) the Director had provided Pitts with access to sufficient legal resources in compliance with the requirements of the County Jail Standards. In its ruling, the trial court noted that the videos that Pitts had submitted showed Pitts fighting with correctional officers and using a taser to repeatedly shock a correctional officer. The trial court found from those videos that Pitts was a violent person and that the restrictions placed upon him in the jail were reasonable and necessary.

¶ 15          Upon being notified of the trial court's ruling, Pitts appealed.

¶ 16                                        II. ANALYSIS

¶ 17          On appeal, Pitts argues that the trial court erred in denying his complaint for *mandamus* relief. Pitts asserts that the trial court's ruling was erroneous for several reasons. First, Pitts

contends, the trial court failed to conduct a proper hearing on the *mandamus* complaint in that the trial court failed to hold a *Boose* hearing (see *People v. Boose*, 66 Ill. 2d 261, 265-67 (1977)) at the outset of the proceedings, failed to conduct the *mandamus* hearing in a formal manner, failed to admit the parties' exhibits into evidence, and failed to render a complete ruling as to all of the issues raised by Pitts in the complaint. Second, Pitts contends, the trial court incorrectly interpreted the various applicable sections of the County Jail Standards and also incorrectly determined that section 3-8-7(b)(1) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/3-8-7(b)(1) (West 2018)) did not apply to Pitts in this case. Third, Pitts contends, the trial court incorrectly found, under the facts of this case, that Pitts had not been denied access to barber services, a sufficient law library, or his legal and correspondence materials. For all of the reasons stated, Pitts asks that we reverse the trial court's judgment; that we grant his complaint for *mandamus* relief; and that we remand this case, if necessary, for further proceedings.

¶ 18        The Director argues that the trial court's ruling was proper and should be upheld. In support of that argument, the Director asserts that the trial court correctly conducted the hearing on the *mandamus* complaint; correctly interpreted the various sections of the County Jail Standards; correctly determined that section 3-8-7 of the Unified Code did not apply in this case; correctly found that the Director had not denied Pitts access to barber services, a law library, or legal and correspondence materials; and correctly denied Pitts's complaint for *mandamus* relief. The Director asks, therefore, that we affirm the trial court's judgment.

¶ 19        Although there is some uncertainty in the law as to the standard of review that applies on appeal when an appellate court reviews a trial court's grant or denial of a complaint for *mandamus* relief (*Pate v. Wiseman*, 2019 IL App (1st) 190449, ¶ 27 (recognizing that the standard of review that applies on appeal to a trial court's grant or denial of a *mandamus*

7

complaint is unclear)), in situations such as the present case, where the trial court's denial of the *mandamus* complaint was based primarily upon factual grounds, the appellate court will not reverse the trial court's ruling unless it is against the manifest weight of the evidence (see *Duane v. Hardy*, 2012 IL App (3d) 110845, ¶ 11). A ruling is against the manifest weight of the evidence only if it is clearly evident from the record that the trial court should have reached the opposite conclusion or if the ruling itself is unreasonable, arbitrary, or not based on the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006). However, to the extent that we are called upon in this appeal to interpret the relevant provisions of the applicable statutes and regulations, that task is a question of law to which we apply a *de novo* standard of review on appeal. See *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 50 (stating that statutory interpretation is a question of law that is subject to *de novo* review on appeal); *People v. Montalvo*, 2016 IL App (2d) 140905, ¶ 18 (indicating that interpretation of the Illinois Administrative Code is also reviewed *de novo* on appeal).

¶ 20        *Mandamus* relief is an extraordinary remedy that is used to compel a public officer to perform a mandatory and nondiscretionary official duty. *McFatridge v. Madigan*, 2013 IL 113676, ¶ 17. In order to obtain *mandamus* relief, the plaintiff must establish the following three elements: (1) that the plaintiff has a clear right to the relief requested, (2) that the public officer has a clear duty to act, and (3) that the public officer has clear authority to comply with an order granting *mandamus* relief. *Id.* As the elements indicate, *mandamus* may not be used to compel a public officer to perform an act that involves the exercise of the officer's discretion or to direct the manner in which a discretionary act is performed, even if the officer's discretion has been exercised erroneously. See *id.*; *Turner-El v. West*, 349 Ill. App. 3d 475, 479-80 (2004).

8

¶ 21    In the *mandamus* complaint in the present case, Pitts sought to compel the Director to comply with the County Jail Standards (see 20 Ill. Adm. Code 701), which, among other things, require that county jail facilities provide detainees with access to barber services and legal resources and prohibit county jail facilities from imposing mail restrictions on detainees as disciplinary sanctions. See 20 Ill. Adm. Code 701.100(b)(4) (2014); 20 Ill. Adm. Code 701.230(a) (1997); 20 Ill. Adm. Code 701.180(h) (2014). There are three sections of the County Jail Standards that are involved in this case: section 701.100, section 701.230, and section 701.180. Section 701.100 of the County Jail Standards, which addresses clothing, personal hygiene, and grooming, requires that "[b]arber and beautician services shall be made accessible [to detainees] but must not violate required security measures." 20 Ill. Adm. Code 701.100(b)(4) (2014). Section 701.230, which addresses library services, requires that "up-to-date informational, recreational, legal, and educational resources" be made available to detainees. 20 Ill. Adm. Code 701.230(a) (1997). The section goes on to specify the two legal materials that must be provided: the Illinois Compiled Statutes and the current jail rules and regulations. 20 Ill. Adm. Code 701.230(a)(1), (2) (1997). Finally, section 701.180 of the County Jail Standards, which addresses mail procedures, provides that "[n]o disciplinary restrictions shall be placed on a detainee's mail privileges." 20 Ill. Adm. Code 701.180(h) (2014). A somewhat similar provision is contained in section 3-8-7 of the Unified Code, which Pitts also relies upon here. See 730 ILCS 5/3-8-7(b)(1) (West 2018) (providing that "[c]orporal punishment and disciplinary restrictions on diet, medical or sanitary facilities, mail or access to legal materials are prohibited").

¶ 22    The County Jail Standards are part of the Illinois Administrative Code. When interpreting such provisions, this court applies the rules of statutory construction. See *Ress v. Office of the*

9

*State Comptroller*, 329 Ill. App. 3d 136, 142 (2002) (stating that the rules of statutory construction apply when a court is construing the provisions of the Illinois Administrative Code). The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature (or drafters, in the case of Administrative Code provisions). *Gaffney*, 2012 IL 110012, ¶ 56; *Ress*, 329 Ill. App. 3d at 142 (applying the rules of statutory construction to Illinois Administrative Code provisions). The most reliable indicator of that intent is the plain and ordinary meaning of the language of the statute itself. *Gaffney*, 2012 IL 110012, ¶ 56; *Ress*, 329 Ill. App. 3d at 142. In determining the plain meaning of statutory terms, a court should consider the statute in its entirety and keep in mind the subject the statute addresses and the apparent intent of the legislature in enacting the statute and, when possible, should construe the statute in such a manner as to give effect to every word, clause, and sentence, so that no part of the statute is rendered superfluous or meaningless. See 5 ILCS 70/1.01 (West 2018) (in construing a statute, "[a]ll general provisions, terms, phrases and expressions shall be liberally construed in order that the true intent and meaning of the General Assembly may be fully carried out"); *Blum v. Koster*, 235 Ill. 2d 21, 29 (2009); *Palm v. Holocker*, 2018 IL 123152, ¶ 21. If the statutory language is clear and unambiguous, it must be applied as written, without resorting to further aids of statutory construction. *Gaffney*, 2012 IL 110012, ¶ 56. A court may not depart from the plain language of the statute and read into it exceptions, limitations, or conditions that are not consistent with the express legislative intent. *Id.* However, if the language of a statute is ambiguous in that it is susceptible to more than one reasonable interpretation, a court may consider extrinsic aids to determine the meaning of the statutory language. See *Williams v. Illinois State Scholarship Comm'n*, 139 Ill. 2d 24, 51 (1990).

¶ 23    Upon reviewing the record in the present case, we find that Pitts failed to establish that he was entitled to *mandamus* relief. See *McFatridge*, 2013 IL 113676, ¶ 17. An evidentiary hearing was held in this case, and the trial court heard the testimony of the Director and Pitts. After listening to that testimony and viewing the two jail video recordings that Pitts had submitted, the trial court found that the Director had provided Pitts with access to barber services and legal resources and that Pitts had not been denied access to correspondence and legal materials. Those findings were well supported by the evidence.

¶ 24    First, with regard to Pitts's claim of denial of access to barber services, the Director testified that barbering tools—such as trimmers and plastic trimmer guards—were provided to the detainees at the jail, including Pitts, so that they could cut their own hair or cut each other's hair. Pitts agreed in his testimony that barbering tools had been provided. That other inmates had stolen the plastic trimmer guards, as Pitts had testified, was not a failure or refusal to act on the Director's part and could not, therefore, be remedied through a *mandamus* proceeding. See *id.* (indicating that a *mandamus* proceeding is used to compel a public officer to perform a mandatory and nondiscretionary official duty). Nor can we find as a matter of interpretation that section 701.100(b)(4) of the County Jail Standards requires the county jail to provide Pitts and the other detainees with access to a barber, as Pitts suggests. If that were the case, the regulation would have plainly stated as much—that detainees must be given access to a "barber"—rather than requiring that detainees be given access to "[b]arber *** services." See 20 Ill. Adm. Code 701.100(b)(4) (2014). The additional word, "services," must be given meaning, if possible, and when considered with the rest of the language of that part of the regulation—that the services must not violate required security measures—is an indication that the Director has discretion to determine the most appropriate and secure manner in which to satisfy that requirement under the

11

circumstances. See *Palm*, 2018 IL 123152, ¶ 21 (indicating that when a court construes a statute, it should, when possible, construe the statute in such a manner as to give effect to every word, clause, and sentence, so that no part of the statute is rendered superfluous or meaningless); *Blum*, 235 Ill. 2d at 29 (stating that in determining the plain meaning of statutory terms, a court should consider the statute in its entirety and keep in mind the subject the statute addresses and the apparent intent of the legislature in enacting the statute). At the very least, the term, "barber *** services" is ambiguous, which would mean that Pitts cannot establish that he has a clear right to the relief requested. See *McFatridge*, 2013 IL 113676, ¶ 17 (indicating that to obtain *mandamus* relief, the plaintiff must prove, among other things, that he or she has a clear right to the relief requested).

¶ 25    Second, as for Pitts's claim of denial of access to legal resources, the Director testified that legal materials, including the Illinois Compiled Statutes and the jail rules and regulations, were made available to detainees through wall kiosks located throughout the facility and through computers located on carts in various areas of the facility. Pitts's own testimony on the matter corroborated that of the Director in most respects as Pitts testified that he could access the legal materials specified, even while he was in disciplinary segregation, on a computer in the booking area. The concerns that Pitts raised in his testimony about the legal resources—that he did not believe they were up to date and that he could not find jury instructions on the computer—were for the trial court, as the trier of fact, to consider and weigh in determining whether the Director had complied with the requirements of the County Jail Standards. See *Best*, 223 Ill. 2d at 350-51 (indicating in a different context where the manifest weight standard of review was applied that the appellate court would not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn).

12

Furthermore, to the extent that Pitts relies upon section 3-8-7(b)(1) of the Unified Code to support his claim of denial of access to legal resources, that statutory section does not apply here because Pitts is a detainee in the county jail and not an inmate in the Illinois Department of Corrections. See *People v. Lindsey*, 199 Ill. 2d 460, 478-79 (2002) (finding that a Unified Code provision did not apply to a defendant who was confined to a county facility and was not an inmate in the Department of Corrections).

¶ 26 Third, with regard to Pitts's claim of restriction of access to correspondence materials, the Director testified that Pitts's access to such materials was not denied. At most, according to the Director, items may have been removed from Pitts's cell temporarily, following a disciplinary infraction, so that correctional staff could make sure that Pitts's cell was clean. Upon the correctional staff doing so, those items would have been promptly returned to Pitts. Pitts disagreed with that testimony. However, as noted above, it was for the trial court, as the trier of fact in this case, to determine whether to believe the Director's or Pitts's version of events, and we cannot find that the trial court's determination on that matter here was against the manifest weight of the evidence. See *Best*, 223 Ill. 2d at 350-51.

¶ 27 Fourth and finally, although Pitts claims that the trial court failed in this case to hold a proper hearing on the *mandamus* complaint, the record does not support that contention. To the contrary, the record shows that the trial court conducted a relatively standard evidentiary hearing on the *mandamus* complaint with both Pitts and the Director present; that both sides were allowed to present witness testimony and physical evidence in support of their positions; that after all of the evidence had been presented, the trial court took the case under advisement so that it could review the law on *mandamus* relief; and that after the trial court considered the evidence presented and the law in this area, it ultimately concluded in a thorough and complete written

13

order that Pitts's request for *mandamus* relief should be denied. Under those circumstances, we find that there was nothing improper about the manner in which the trial court proceeded with, and ruled upon, Pitts's *mandamus* complaint in the present case.

¶ 28　　　　In reaching that conclusion, we note that Pitts did not at any time object in the trial court to the manner in which the hearing was conducted and arguably may, therefore, have acquiesced in the procedure used by the trial court. See *Steiner v. Eckert*, 2013 IL App (2d) 121290, ¶ 15 (recognizing that a party may not acquiesce in procedure followed in the trial court and then complain about that procedure on appeal). In addition, although Pitts points to the trial court's alleged use of an "informal" procedure as an indication that the hearing was conducted improperly, the record shows that the informality to which the trial court referred in its comments during the hearing was merely the trial court's decision to allow the Director's attorney to proceed with her direct examination of the Director immediately after Pitts's direct examination had concluded, rather than having the Director's attorney wait until the Director's case-in-chief to proceed with her direct examination of the Director. Such a decision was well within the trial court's discretion to make in conducting the hearing in this case. See *In re T.R.*, 2019 IL App (4th) 190529, ¶ 87 (recognizing in a different context that the trial court generally has broad discretion over the manner in which it conducts hearings). Furthermore, although Pitts claims that the trial court's ruling was incomplete because the trial court did not rule upon Pitts's request to have the trial court order the Director to prohibit his staff from taking away Pitts's access to correspondence or legal materials in the future, such a ruling was unnecessary once the trial court determined, as a factual matter, that Pitts's access to correspondence and legal materials had not been taken away. As a final matter, while Pitts complains that the trial court failed to hold a *Boose* hearing to determine whether Pitts should have remained in shackles

14

during the *mandamus* complaint proceeding, any error that possibly occurred in that regard was harmless as the record in this case clearly shows that Pitts was not entitled to *mandamus* relief. See *In re A.H.*, 359 Ill. App. 3d 173, 184 (2005) (finding that the trial court's failure to conduct a *Boose* hearing to determine whether a respondent-father should remain shackled during a parental rights termination proceeding was harmless beyond a reasonable doubt because the father's depravity, the alleged basis of parental unfitness, was supported by overwhelming evidence).

¶ 29                                      III. CONCLUSION

¶ 30        For the foregoing reasons, we affirm the judgment of the circuit court of Kankakee County.

¶ 31        Affirmed.

**No. 3-19-0267**

| | |
|---|---|
| **Cite as:** | *Pitts v. Kolitwenzew*, 2020 IL App (3d) 190267 |
| **Decision Under Review:** | Appeal from the Circuit Court of Kankakee County, No. 19-MR-88; the Hon. Ronald J. Gerts, Judge, presiding. |
| **Attorneys for Appellant:** | Jacob P. Pitts, of Kankakee, appellant *pro se*. |
| **Attorneys for Appellee:** | Jim Rowe, State's Attorney, of Kankakee (Nancy Nicholson, Assistant State's Attorney, of counsel), for appellee. |