2025 IL App (2d) 230272-U
No. 2-23-0272
Order filed June 20, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF CHARLENE KALEBIC n/k/a Carlene Quint, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Petitioner-Appellant, | ) ) | |
| and | ) ) | No.   12-D-2257 |
| | ) ) | Honorable |
| THOMAS KALEBIC, | ) ) | Ari P. Fisz and Michael B. Betar, |
| Respondent-Appellee. | ) | Judges, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) Division of the trial court that hears collection cases did not abdicate its duty to enforce judgment; (2) "cash payments" provided for in marital settlement agreement did not constitute an obligation "in the nature of alimony" and therefore were not available for enforcement against respondent's social security benefits; and (3) petitioner forfeited argument that the division of the trial court that hears collection cases erred in declining to calculate the dollar amount of unpaid maintenance.

¶ 2    Petitioner, Charlene Kalebic, now known as Charlene Quint, appeals from two orders of the circuit court of Lake County relating to the dissolution of her marriage to respondent, Thomas Kalebic. Petitioner argues that the trial court erred in (1) denying her motion for a turnover order

directed to the Social Security Administration (SSA) and dismissing her citation to discover assets to the SSA and (2) denying her motion to reconsider and refusing to determine what portion of a September 8, 2020, judgment was maintenance. We affirm.

¶ 3                                    I.  BACKGROUND

¶ 4          A. Judgment of Dissolution of Marriage and Marital Settlement Agreement

¶ 5      The parties married on November 29, 1992. Petitioner filed a petition for dissolution of marriage on November 28, 2012. The parties entered into a marital settlement agreement (MSA), and the trial court entered a judgment of dissolution of marriage (JDM) on April 21, 2014. The JDM incorporated the MSA by reference.

¶ 6      Article III of the MSA is labelled "Maintenance and Maintenance Waivers." Pursuant to paragraph 3.2 of Article III, respondent agreed to pay petitioner "non-modifiable maintenance" in the amount of $4,412 per month commencing on May 1, 2014, and on the first day of each month thereafter until respondent made 102 payments totaling $450,000. Paragraph 3.3 of Article III governed the tax treatment of maintenance and provided that the sums paid by respondent to petitioner pursuant to paragraph 3.2 "shall be includible in [petitioner's] gross income and shall be deductible from [respondent's] gross income for purposes of federal and state income taxation." Further, paragraph 3.1 of Article III provides:

> "3.1 **Maintenance Waivers.** The [respondent] and [petitioner] hereby stipulate that, except for the maintenance that is provided for in this Agreement, each is able to be self-supporting through appropriate employment and/or through property ownership, including marital and non-marital property apportioned to him or her pursuant to this Agreement, to provide for his or her reasonable needs for maintenance and support. Accordingly, each party hereby waives, remises and releases any and all claims against the

other for maintenance, alimony and spousal support, whether past, present or future, and the parties hereby stipulate that this Agreement, when effective, shall terminate and bar each party's rights to receive maintenance, alimony or spousal support from the other, whether past, present or future.

Paragraph 3.3 also states that the sums paid by respondent to petitioner pursuant to paragraph 3.2 "are acknowledged to be paid incident to the Judgment and in discharge of [respondent's] legal obligation to support [petitioner]."

¶ 7     Article VIII of the MSA is labelled "Property Settlement for Wife." Article VIII apportioned to petitioner certain assets, including bank accounts, investment accounts, retirement accounts, business interests, personal property, insurance policies, and a 2003 Jaguar automobile. In addition, pursuant to paragraph 8.4 of Article VIII, titled "Cash Payments to Wife," respondent agreed to pay petitioner: (1) $500,000 upon the effective date of the MSA; (2) $300,000 upon the sale of the parties' Lake Forest home or June 30, 2015, whichever first occurred; and (3) $17,157 per month beginning on May 1, 2014, and continuing on the first day of each month thereafter until respondent made 102 payments totaling $1,750,000. Paragraph 8.8 states that the division of property under Article VIII:

"is contemplated and intended to be a non-taxable division to both [petitioner] and [respondent] of mutually acquired property acknowledging their respective contributions to the accumulated marital estate and as such is not a sale, payment, or transfer to secure a release of marital rights, but is a division by and between the parties of the marital property in which they have a common ownership and mutually acquired during the marriage in accordance with Section 503(e) of the Illinois Marriage and Dissolution of Marriage Act [(750 ILCS 5/503(e) (West 2012))]. Therefore, the above division of property is a non-

taxable transaction, to the [respondent] or [petitioner]."

Article IX of the MSA is labelled "Property Settlement for Husband" and apportioned to him certain bank accounts, investment accounts, retirement accounts, business interests, personal property, insurance policies, three vehicles, and real estate in Lake Forest, Illinois and in Lake Geneva, Wisconsin. Article X of the MSA contained an acceleration clause, whereby all outstanding payments required by paragraphs 3.2 and 8.4 of the MSA became immediately due and payable if respondent failed to cure a default within 120 days. Article X also imposed an annual interest rate of 9% on the unpaid portion of any outstanding payments required by paragraphs 3.2 and 8.4 of the MSA. Article XVI of the MSA is labelled "General Provisions" and includes provisions that, among other things, address the construction of the agreement.

¶ 8                                 B. Contempt Order Proceedings

¶ 9     Respondent defaulted on his obligations to timely pay petitioner the amounts required by paragraphs 3.2 and 8.4 of the MSA. As a result, on July 16, 2019, petitioner filed a petition for rule to show cause for indirect civil contempt of court and a petition to enforce the JDM. The former pleading contained three counts: (1) failure to pay maintenance; (2) failure to make cash payments; and (3) failure to pay per the acceleration clause. Petitioner alleged that following the entry of the JDM, respondent paid maintenance pursuant to Article III of the MSA until January 7, 2019, at which point he stopped paying. Petitioner prayed that the trial court order respondent to pay past-due maintenance in the amount of $26,472.[1] Petitioner further alleged that following the entry of the JDM, respondent made cash payments pursuant to Article VIII of the MSA until

---

[1] Although not specified in the petition for rule to show cause, the $26,472 represents the six past-due payments of $4,412, from February 2019 through July 2019.

January 7, 2019, at which point he stopped paying. Petitioner prayed that the trial court order respondent to pay her $102,942, representing six past-due cash payments. Finally, petitioner alleged that pursuant to the acceleration clause in Article X of the MSA, respondent owed her an additional $998,244.31, as of July 1, 2019, which amount continued to increase daily by accrued interest at a rate of $252.18 per day. The petitions were set for a hearing before Judge Charles W. Smith, who, at that time, was assigned to the family division of the 19th Judicial Circuit.

¶ 10    On August 29, 2019, Judge Smith ordered respondent to appear before the court on October 17, 2019, to show cause why he should not be held in contempt. Following several continuances, on September 8, 2020, Judge Smith held an evidentiary hearing via the Zoom platform. The record on appeal does not contain a transcript from that hearing or an acceptable substitute, such as a bystander's report or an agreed statement of facts. See Ill. S. Ct. R. 323(c), (d) (eff. July 1, 2017). However, Judge Smith's ruling was memorialized in a typewritten order and on a pre-printed "Order of Contempt" form, both of which were prepared by petitioner's attorney. In the typewritten order, Judge Smith found respondent in contempt of court. Judge Smith set the purge amount at $100,000. Further, Judge Smith awarded a judgment against respondent and in favor of petitioner in the amount of $1,048,572.41, including interest. On the pre-printed "Order of Contempt" form, petitioner's attorney checked a box indicating that respondent failed to pay certain amounts. Below that section, petitioner's attorney checked a box labeled "Maintenance," but he left blank the corresponding space to enter an amount of past-due maintenance. Petitioner's attorney also checked a box labeled "Other" and on the adjacent line wrote "[c]ash payments totaling 1,048,572.41 through 9/4/20, including interest."

¶ 11                              C. Post-Contempt-Order Proceedings

¶ 12    Neither party appealed the September 8, 2020, orders. But, following entry of the orders,

petitioner filed several motions. Among these motions were an October 1, 2020, "Motion to Modify Order and for Judgment" in which she asked to receive 100% of any net proceeds from the sale of a house and respondent's boat. On October 13, 2020, petitioner also filed a "Motion to Modify Order and Judgment of September 8, 2020, to Include Trusts in Which Thomas V. Kalebic is Grantor, Beneficiary, or Trustee." These motions were eventually denied. Meanwhile, respondent purged himself of contempt by paying $100,000 to petitioner. However, respondent then failed to make additional payments on the September 8, 2020, judgment. Respondent's failure to pay led to supplementary proceedings by petitioner to collect on the judgment. This, in turn, resulted in a series of turnover orders allowing petitioner to collect funds based on the sale of a house, respondent's boat, and respondent's personal property, including jewelry, works of art, and a gun collection.

¶ 13                    D. Citation Proceedings Against the SSA

¶ 14    On April 12, 2022, petitioner's attorney appeared at a citation proceeding before Judge Michael B. Betar, a judge hearing collections cases in the 19th Judicial Circuit. As a result of that proceeding, Judge Betar granted petitioner leave to file a first alias citation to discover assets against the SSA. On April 18, 2022, petitioner issued the citation to the SSA, which citation stated that a judgment in petitioner's favor and against respondent was entered on September 8, 2020, in the amount of $1,048,572.41, and that $935,444.29 remained unsatisfied.

¶ 15    On May 24, 2022, petitioner moved for entry of a turnover order against the SSA for garnishment of 65% of respondent's monthly social security income. In the motion, petitioner asserted that on September 8, 2020, Judge Smith entered a judgment in the amount of $1,048,572.41, "which consists of unpaid spousal maintenance equal to or greater than $218,934.47." Petitioner further asserted that orders for support entered under the Illinois Marriage

and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/101 *et seq.* (West 2022)) are subject to the Income Withholding for Support Act (Withholding Act) (750 ILCS 28/1 *et seq.* (West 2022)). Petitioner argued that federal and state law allow social security payments to be garnished for maintenance arrearages. She therefore requested that the court enter a continuing turnover order to the SSA for 65% of respondent's social security benefits.

¶ 16    On June 21, 2022, respondent filed a response to petitioner's motion for entry of a turnover order against the SSA. Respondent asserted that the Withholding Act is only applicable to support obligations and does not apply to property settlements. Referencing a June 1, 2022, motion to allocate payments (discussed below) and noting that his entire maintenance obligation under the MSA was only $450,000, respondent asserted that any suggestion that the amount of $1,048,572.41 arises out of a domestic support obligation is erroneous. As such, respondent contended that until the divorce court allocates a portion, if any, of the September 8, 2020, judgment to his maintenance obligation, the court "cannot enter a turn-over order of Social Security Benefits because said benefits are exempt from attachment to satisfy a Judgment relating to a property settlement award."

¶ 17    In the reply in support of her motion for entry of a turnover order against the SSA, petitioner contended that both the maintenance and cash payments provided for in the MSA were "either non-taxable or taxable maintenance payments." She explained that because the tax laws in effect at the time of the MSA provided for "maintenance" to be taxable, to avoid tax issues with the IRS, the MSA "labeled the[] non-modifiable, tax-free payments as 'Cash Payments' " while other obligations respondent owed petitioner "were labeled as taxable 'Maintenance' payments."

¶ 18                          E. Motion to Allocate

¶ 19    Meanwhile, on June 1, 2022, respondent filed in the family division of the 19th Judicial

Circuit, a motion to allocate payments on judgment. In this motion, respondent asserted that Judge Smith's September 8, 2020, orders did not specify what portion of the judgment was attributable to maintenance and what portion was attributable to the property division set forth in the MSA. Respondent requested the court to enter an order allocating the judgment between spousal maintenance and the property settlement.

¶ 20     On July 26, 2022, petitioner filed a motion to dismiss respondent's motion to allocate payments on judgment. Petitioner cited three principal reasons for dismissal. First, petitioner asserted that respondent cited "no authority in his preamble for the relief he seeks." Second, relying on section 2-619(a)(5) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(5) (West 2022)), petitioner argued that respondent's motion constituted an untimely request for postjudgment relief as the motion was filed more than 30 days after the order of contempt was entered. See 735 ILCS 5/2-1203 (West 2022). Finally, petitioner observed that section 2-619(a)(3) of the Code (735 ILCS 5/2-619(a)(3) (West 2022)) provides that a court may involuntarily dismiss a pleading if there is another action pending between the same parties for the same cause. Petitioner noted that following entry of judgment on her petition for indirect civil contempt against respondent, she instituted collection proceedings. According to petitioner, respondent's motion was an attempt to have the family division "enter orders on the same subject matter before Judge Betar in the citation proceeding *** between these same parties." Petitioner therefore asked the court to dismiss respondent's motion to allocate "whether as an untimely Motion to Reconsider or as new litigation between the same parties regarding the same subject matter."

¶ 21     On August 22, 2022, respondent filed a response to petitioner's motion to dismiss his motion to allocate payments of judgment. In his response, respondent characterized his motion to allocate as "a pleading asking for an accounting of monies paid and to which debts they are

allocated." Respondent asserted that he properly filed his motion in the family division because, pursuant to section 16.6(j) of the MSA and section 511 of the Marriage Act (750 ILCS 5/511 (West 2022)), the family division of the "[c]ourt retains jurisdiction regarding any disputes related to this matter." Respondent acknowledged that "there is litigation pending before Judge Betar," but he denied that Judge Betar has jurisdiction to allocate payments as to what constitutes maintenance and what constitutes property. According to respondent, "[t]he issue of the amount attributable to spousal maintenance and the amount attributable to the property division is within the purview of the family court."

¶ 22    In her reply to respondent's response, petitioner asserted that her petition for contempt, which was granted by Judge Smith, "clearly states the amounts of unpaid maintenance and unpaid cash property settlement payments together with the interest owed on each." According to petitioner, in granting the petition for contempt, "without stating any different amounts, Judge Smith adopted the amounts stated in [her] petition as true and correct." Petitioner therefore denied that "anything in the matter before Judge Betar would require [him] to allocate payments between maintenance and property inasmuch as the Judgment and subsequent Order on Petition for Enforcement already did so by adopting the figures in [her] Petition as correct."

¶ 23          F. Hearing on Motion to Dismiss Respondent's Motion to Allocate

¶ 24    On September 27, 2022, Judge Ari P. Fisz of the family division held a hearing on petitioner's motion to dismiss respondent's motion to allocate payments of judgment. Following argument by the parties, Judge Fisz granted the motion to dismiss without prejudice based on respondent's failure to cite any authority in his motion. The court granted respondent 21 days to replead.

¶ 25          G. Amended Motion to Enforce and Clarify

¶ 26    On October 18, 2022, respondent filed an "amended motion" in the family division to enforce and clarify the orders of September 8, 2020, with respect to the allocation of the amounts paid and credited towards the judgment of petitioner. Respondent alleged that the judgment entered on September 8, 2020, did not specify what portion was attributed to spousal maintenance and what portion was attributed to the division of property. While acknowledging that a matter was before Judge Betar on a citation to discover assets to enforce the judgment, respondent argued that the allocation of the payments to determine what share is attributable to spousal maintenance and what share is attributable to property settlement is within the purview of the family court, not the collections court, as the family court retains jurisdiction to clarify and enforce the judgment. See 750 ILCS 5/511 (West 2022).

¶ 27    Petitioner responded, arguing that the case is in collections court and that respondent had no "equitable basis" to argue that the judgment should be treated as property rather than maintenance. She denied that the September 8, 2020, judgment had to specify what portion resulted from spousal maintenance and what portion resulted from property division. Petitioner admitted that the family division retains jurisdiction to enforce the judgment, but denied that section 511 of the Marriage Act (750 ILCS 5/511 (West 2022)) provides for clarification or enforcement of the judgment here because respondent is seeking to "recharacterize the payments." She argued that the entire amount of the September 8, 2020, judgment should be treated as maintenance.

¶ 28              H. Hearing on Amended Motion to Enforce and Clarify

¶ 29    In an order entered November 23, 2022, Judge Fisz transferred the matter to Judge Smith (Judge Smith entered the September 8, 2020, orders, but was no longer assigned to the family division) and continued the matter to the following month.

¶ 30    At a hearing on December 15, 2022, Judge Smith, after listening to the parties' arguments,

specifically noted that on the September 8, 2020, pre-printed "Order of Contempt" form, maintenance was checked, but no amount was written in. Further, the pre-printed form reflects other cash payments totaling $1,048,572.41, including interest. Judge Smith then remarked:

"Somebody—Mr. Del Re [petitioner's previous attorney] took the time to calculate even with interest what [respondent] owed to that date. And although maintenance is checked, no amount is written in.

And then yes, I may—I set a purge of a hundred thousand dollars. And I stayed the sentence of contempt to give him time to do that. From that order no appeal has been taken. No motion for clarification.

And [petitioner] say[s], well these payments are in the nature of maintenance. [Petitioner] did not come into court and say, well, Judge, I want you to find that those are maintenance payments. [Petitioner is] now wanting me to go back and interpret *** the MSA from 2014 to say all the payments no matter what label were put on them are in the nature of maintenance. That evidence was never presented."

Ultimately, Judge Smith denied respondent's motion, stating that he did not have jurisdiction to reconstruct the September 8, 2020, order of contempt and determine what portion of the judgment was attributable to maintenance more than two years after its entry. Judge Smith explained that if an allocation was presented, "they should have been part of the findings and an appeal should have been taken within thirty days" of September 8, 2020. He stated that he could not remember "what findings [he] made twenty-seven months ago to reach [the September 8, 2020,] order." Therefore, Judge Smith concluded that he lost jurisdiction over the September 8, 2020, order on October 8, 2020.

¶ 31     Judge Smith also pointed out that the petition for contempt sought maintenance in the

amount of $26,472, so "it would be very difficult for a Court to find that that wasn't the amount." Judge Smith invited the parties to put together a stipulation and then come in on a motion to clarify. In addition, Judge Smith rejected any argument by petitioner that the full amount of the cash payments constituted maintenance as that issue was not before the court in 2020. Rather, the issue before the court concerned the amount owed by respondent. Judge Smith further remarked that, in September 2020, petitioner's attorney did not ask him to allocate the amount owed by respondent between maintenance and property. To the contrary, petitioner's attorney "prepared the order and the order has no amount in it for maintenance."

¶ 32                    I. Additional Proceedings Before Judge Betar

¶ 33    During the proceedings on the parties' motion practice in the family division, Judge Betar continued the motion for entry of turnover order against the SSA from time to time. Following Judge Smith's ruling on December 15, 2022, the matter returned to Judge Betar. On February 15, 2023, Judge Betar entered an order granting the parties leave to issue limited discovery solely on the issue of accounting for the payments made by respondent to petitioner under the MSA.

¶ 34    On February 28, 2023, respondent filed a motion to reconsider the February 15, 2023, order. Respondent noted that he filed a motion in the family division of the court to determine what portion of the September 8, 2020, order constituted maintenance and what portion constituted a property settlement, but his request was denied as untimely. Respondent argued that if the family division lacked authority to modify the September 8, 2020, order, so would any other division of the court. Respondent also asserted that the doctrine of *res judicata* bars revisitation of the allocation of the maintenance and property settlement arising from the divorce proceeding. Respondent reasoned that because there is no procedural basis to modify the language of the September 8, 2020, order, there is no reason for the parties to conduct discovery to account for and

classify the payments made pursuant to the MSA.

¶ 35    In a written order entered on April 14, 2023, Judge Betar granted respondent's motion to reconsider "on the basis that the determination of what portion of the September 8, 2020 Judgment Order and Contempt Order in this case in the amount of $1,048,572.41 entered by the Honorable Charles Smith in the family law court relates to unpaid maintenance and what portion relates to unpaid property settlement" was "better determined by, and within the purview of, the family law court *** rather than *** the collections court in the Civil Division." In conjunction with this ruling, Judge Betar denied petitioner's motion for entry of a turnover order against the SSA, dismissed the citation to discover assets issued to the SSA, and discharged the SSA.

¶ 36    On May 10, 2023, petitioner filed a motion to reconsider the April 14, 2023, order. In her motion, petitioner alleged that the request for leave to issue discovery granted by the February 15, 2023, order was made by respondent's attorney in open court and petitioner did not object to this request. Petitioner further alleged that, "after [the] Court granted [respondent] exactly what he had requested," respondent moved to reconsider the February 15, 2023, ruling.[2] Petitioner asserted that Judge Betar granted the motion to reconsider without giving her an opportunity to respond. Petitioner then argued that based on undisputed statements by respondent, the amounts of maintenance and cash payments owed to her were "both an incontrovertible mathematical fact and a binding judicial admission." Despite arguing in her motion to reconsider that these amounts were based on "uncontroverted fact," petitioner argued that the amount owed to her for unpaid

---

[2] The record on appeal does not contain a transcript from the February 15, 2023, hearing or an acceptable substitute, such as a bystander's report or an agreed statement of facts. See Ill. S. Ct. R. 323(c), (d) (eff. July 1, 2017). However, at the hearing on petitioner's motion to reconsider, respondent's attorney disputed that he requested leave to issue discovery. Judge Betar indicated that one of the parties made the request, but he could not recall who.

maintenance and cash payments as of September 8, 2020, was $1,025,386.39, not the $1,048,572.41 reflected in the September 8, 2020, orders. Further, based on alleged judicial admissions by respondent, petitioner asserted that, as of May 3, 2023, the total amount owed under the maintenance portion of the judgment entered on September 8, 2023, was $189,797.83. Finally, petitioner argued that she was deprived of her right to due process at the hearing on the motion to reconsider because she was not permitted to present evidence on her own behalf.

¶ 37    In his response, respondent argued that throughout these proceedings, petitioner had argued that the entire amount of the September 8, 2020, judgment order constituted maintenance and that she refused to cooperate with his efforts to have the family division specify what portion of the judgment related to unpaid maintenance under Article III of the MSA and what portion related to the property settlement under Article VIII of the MSA. However, having failed to convince either Judge Smith or Judge Betar that the entire amount of the judgment constituted maintenance, petitioner was now attempting to recast her position that not all of the judgment related to maintenance. To succeed, petitioner had to reverse her position that the September 8, 2020, judgment cannot be modified despite the fact that she successfully argued that position before Judge Fisz and Judge Smith. Respondent asserted that just as Judge Smith determined that the family division did not have authority to modify the September 8, 2020, orders, it would be improper for another division of the same court to do so. Respondent added that the doctrine of judicial estoppel "precludes [petitioner] from such gamesmanship."

¶ 38    In the reply in support of her motion to reconsider, petitioner asserted that Judge Betar denied her motion for turnover on the ground that the family court is the best place to determine the allocation between maintenance and property settlement. Yet, petitioner asserted, Judge Smith had already determined prior to the April 14, 2023, ruling that he had lost jurisdiction 30 days after

entry of the September 8, 2020, judgment order and could not make the allocation. Petitioner therefore contended that the collections court is the only court "available with jurisdiction" to determine the allocation between maintenance and property settlement. Petitioner reiterated that, by declining to even hear her evidence, the court was depriving her of due process.

¶ 39    On July 25, 2023, Judge Betar held a hearing on petitioner's motion to reconsider the order of April 14, 2023. Following argument by the parties, Judge Betar took the matter under advisement.

¶ 40    On July 27, 2023, Judge Betar issued a written order denying petitioner's motion to reconsider. In his order, Judge Betar noted that petitioner had taken inconsistent positions in the family division and before the collections court. For instance, respondent's motion to allocate requested the family division of the court to specify what portion of the September 8, 2020, judgment was for maintenance and what portion was for property. Petitioner's attorney argued against that motion, stating that it was untimely. However, petitioner was now asking the collections court to do exactly what she argued the family division could not do—allocate the September 8, 2020, judgment between spousal maintenance and property. Further, during the December 15, 2022, hearing before Judge Smith on respondent's motion to clarify the judgment, petitioner took the position that the entire $1,048,572.41 judgment was for maintenance. At the same hearing, respondent argued that the amount of unpaid maintenance was $198,512. However, in petitioner's motion to reconsider, she argued that unpaid maintenance amounted to $189,797.83. Due to these conflicts, Judge Betar reasoned that Judge Smith was in a better position to determine the amount of unpaid maintenance because the hearing on the petition for rule to show cause and the judgment occurred in family court. Yet, Judge Smith declined to make the allocation, stating that he had no jurisdiction and he could not remember how the calculation leading to the judgment

was made. Judge Smith also observed that it was petitioner's attorney who had drafted the September 8, 2020, orders and failed to include the separate allocations therein.

¶ 41    Judge Betar concluded that petitioner's request for him to determine what portion of the September 8, 2020, judgment was for maintenance was an attempt to obtain the same relief that was denied by Judge Smith. Judge Betar viewed petitioner's request "as a second bite at the apple, forum shopping, or a hope at getting a better result in front of a different Judge." Further, Judge Betar determined that a full hearing on respondent's motion to reconsider was unnecessary, as "the issues were fully flushed out in the previous three rounds of motions and briefs." Petitioner argued before Judge Betar that he needed only to perform a simple mathematical calculation to determine how much of the September 8, 2020, judgment consisted of unpaid spousal maintenance. Judge Betar stated that petitioner could have proposed that to Judge Smith: (1) during the hearing that led to the September 8, 2020, judgment and orders; (2) on a motion to reconsider the September 8, 2020, judgment and orders; or (3) in a motion to clarify the September 8, 2020, judgment and orders within 30 days after their entry. Alternatively, Judge Betar noted that petitioner could have appealed the September 8, 2020, orders or raised the calculation issue at the hearing on respondent's motion for clarification. However, petitioner did none of those things. Moreover, as discussed earlier, Judge Betar emphasized that petitioner offered conflicting figures as to the amounts owed for maintenance and the parties had no agreement as to the exact amount owed. Judge Betar stated that because the portion of the September 8, 2020, judgment attributable to maintenance was unknown, there was no way to determine how much should be taken from respondent's social security benefits by way of a turnover order and, for that reason, he dismissed the citation to discover assets.

¶ 42    On August 15, 2023, petitioner filed a notice of appeal from the orders of April 14, 2023,

and July 27, 2023.

¶ 43                                    II. ANALYSIS

¶ 44     As noted above, on appeal, petitioner argues that Judge Betar erred in (1) denying her motion for a turnover order directed to the SSA and dismissing her citation to discover assets to the SSA and (2) denying her motion to reconsider and refusing to determine what portion of the September 8, 2020, judgment was maintenance. In support of these claims, petitioner focuses on what she perceives are three separate errors made by Judge Betar. First, she argues that Judge Betar "shirk[ed]" his duty to enforce the September 8, 2020, judgment by failing to determine the amount attributable to unpaid maintenance. Second, she argues that Judge Betar did not have to distinguish between respondent's obligations to pay "maintenance" and "cash payments" because both obligations are "in the nature of alimony" and therefore available for enforcement against respondent's social security benefits. Third, petitioner argues that Judge Betar erred in refusing to consider "readily available evidence and admissions" to calculate the dollar amount of the unpaid maintenance. We do not find persuasive any of these arguments.

¶ 45                    A. Whether Judge Betar Abdicated his Responsibility

¶ 46     Petitioner first argues that Judge Betar abdicated his duty because he "failed to determine the amount of capable [*sic*] of enforcement against [respondent's] SSA benefits." According to petitioner, Judge Betar's ruling "creat[ed] an artificial jurisdictional barrier" to the "enforce[ment of] a lawful judgment." Petitioner contends that Judge Betar should have enforced the September 8, 2020, judgment because a trial court, regardless of the division in which it sits, "always has jurisdiction" to enforce a party's obligations under a judgment of dissolution. See 750 ILCS 5/511 (West 2022). Even so, petitioner asserts, Judge Betar "dodged the issue by transferring the dispute to Judge Smith of the Family Division."

¶ 47    As petitioner notes, the ability to enforce the judgment is not conferred upon any one division of a circuit court, but rather, is conferred upon the entire circuit court system. *In re Marriage of Devick*, 315 Ill. App. 3d 908, 913 (2000) ("The allocation of judicial responsibilities to various divisions of a circuit court does not impose barriers to jurisdiction but rather reflects a concern for administrative convenience."). Nevertheless, petitioner's argument that Judge Betar failed to enforce a lawful judgment in the instant matter fails for two principal reasons.

¶ 48    First, Judge Betar *did* enforce the September 8, 2020, judgment. Petitioner's turnover orders related to the Lake Forest home, jewelry, artwork, guns, and other property were granted to enforce the judgment.

¶ 49    Second, petitioner's claim that Judge Betar "dodged the issue" by transferring the issue to Judge Smith in the family division is unsupported by the record. Judge Betar did reason that Judge Smith was in a better position to determine the amount of unpaid maintenance because the hearing on the petition for rule to show cause and the judgment occurred in the family division. However, we find no indication in the record that Judge Betar (or any other judge hearing collections) transferred any proceeding to the family division. Rather, the record demonstrates that after petitioner moved for the entry of a turnover order against the SSA in the collections court, respondent filed a separate motion to allocate in the family division. Judge Fisz of the family division granted petitioner's motion to dismiss respondent's motion to allocate, but allowed respondent to replead. Respondent then filed an amended motion in the family division. Judge Fisz, not Judge Betar, transferred the amended motion to Judge Smith (who, by that time, was no longer assigned to the family division) because Judge Smith had entered the September 8, 2020, orders. Indeed, in her brief, petitioner does not indicate the pages of the record where the alleged transfer by Judge Betar is found, thereby resulting in forfeiture of this argument under Illinois

Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020). See *People v. One Black 2016 Jeep Wrangler Unlimited*, 2025 IL App (2d) 240314, ¶ 28; *Bhutani v. Barrington Bank & Trust Co., N.A.*, 2024 IL App (2d) 230162, ¶ 23. Thus, while Judge Betar did state that the allocation issue is better determined by and in the purview of the family division, we reject the notion that he "dodged the issue" by transferring the case to another division for decision.

¶ 50    Relying on *Devick*, 315 Ill. App. 3d at 913, petitioner asserts that the trial court's "collections and family law divisions are part of the same 'court,' and any judge of that court has the power to hear *all* justiciable issues." (Emphasis in original.) However, following this logic, the family division had the same power to hear the matter as the collections court. "The allocation of judicial responsibilities to various divisions of a circuit court does not impose barriers to jurisdiction but rather reflects a concern for administration convenience." *Devick*, 315 Ill. App. 3d at 913. Further, this court has held that "a successor judge ought to make every effort to understand and defer to *** prior findings." *In re Marriage of Watson*, 2022 IL App (2d) 210137, ¶ 41. Here, out of respect to the prior findings of the family division of the court, Judge Betar deferred to the judge who initially entered the September 8, 2020, orders. We find no error regarding the manner in which Judge Betar handled this case.

¶ 51        B. Whether the Trial Court Erred in Differentiating Maintenance and Property

¶ 52    Petitioner next contends that the trial court erred in finding that she could only claim a portion of the unpaid maintenance through her citation to the SSA. Specifically, petitioner contends that the entire amount of the September 8, 2020, judgment is subject to the garnishment of respondent's social security benefits because, in addition to the maintenance award in paragraph 3.2 of the MSA, the "cash payments" provided for in paragraph 8.4 of the MSA are "in the nature of alimony" and should be treated as maintenance. In support of her position, petitioner asserts

that a court should look beyond the terms and labels used in a judgment of dissolution or a marital settlement agreement, examine the "substance of the transaction," and construe the definition of maintenance broadly. See, *e.g.*, *In re Marriage of Truhlar*, 404 Ill. App. 3d 176, 179-82 (2010); *Roberts v. Roberts*, 190 Ill. App. 2d 184, 189-90 (1967). Petitioner then cites a myriad of cases in which courts looked to the definition of nondischargeable obligations under federal bankruptcy law to determine whether an obligation qualifies as "support." See, *e.g.*, *Truhlar*, 404 Ill. App. 3d at 181-82 (examining federal bankruptcy law in deciding whether the payment of all or part of the college education of a child who has reached the age of majority constitutes payment for "the support and maintenance of the child" within the meaning of the Social Security Act); *In re Tilmon*, 9 B.R. 979, 987-88 (Bankr. N.D. Ill. 1981) (noting that in determining what constitutes support for purposes of dischargeability, a court is not bound by the label placed upon the obligation but must look behind the agreement to determine the essential nature and character of the liability).

¶ 53    To provide context to petitioner's argument, we first look to the relevant provisions of the Social Security Act (42 U.S.C. § 301 *et seq.* (2022)). Social security benefits are subject "to withholding in accordance with State law *** to enforce the legal obligation of the individual to provide child support or alimony." 42 U.S.C. § 659(a) (2022). For purposes of section 659 of the Social Security Act, the term "alimony" is defined in relevant part as "periodic payments for the support and maintenance of the spouse (or former spouse) of the individual." 42 U.S.C. § 659(i)(3)(A) (2022). However, alimony does not include "any payment or transfer of property or its value by an individual to the spouse or a former spouse of the individual in compliance with any community property settlement, equitable distribution of property, or other division of property between former spouses." 42 U.S.C. § 659(i)(3)(B)(ii) (2022). Thus, social security benefits may be reached by a former spouse for maintenance but not for the division of property

assets. *In re Marriage of Hulstrom*, 342 Ill. App. 3d 262, 268-69 (2003). Accordingly, the critical inquiry is whether the parties intended the "cash payments" provided for in paragraph 8.4 of the MSA as maintenance or whether they intended them as part of a division of property assets. The "cash payments" are subject to the garnishment of respondent's social security benefits only if they fall into the former category.

¶ 54    In addressing the issue presented, we must construe the relevant provisions of the MSA. An MSA is construed in the same manner as any other contract. *In re Marriage of Tronsrue*, 2025 IL 130596, ¶ 46. As such, a court must ascertain the parties' intent from the language of the agreement itself. *In re Marriage of Dynako*, 2021 IL 126835, ¶ 15; *Blum v. Koster*, 235 Ill. 2d 21, 33 (2009). When contract terminology is unambiguous, it must be given its plain and ordinary meaning. *Hulstrom*, 342 Ill. App. 3d at 269. However, where the language is ambiguous, the trial court may use parol evidence to determine the parties' intent. *Hulstrom*, 342 Ill. App. 3d at 269. Both the interpretation of a contract and whether an agreement is ambiguous are matters of law subject to *de novo* review. *Dynako*, 2021 IL 12835, ¶ 15; *Hulstrom*, 342 Ill. App. 3d at 269.

¶ 55    As previously noted, petitioner asserts that respondent's social security benefits are subject to garnishment for the entire amount of the September 8, 2020, judgment because, in addition to the maintenance award in paragraph 3.2 of the MSA, the "cash payments" provided for in paragraph 8.4 of the MSA are "in the nature of alimony" and should be treated as support. Petitioner directs us to decisions involving bankruptcy, asserting that courts in such cases, when determining dischargeability in post-dissolution matters, "frequently must distinguish between 'property settlements' and payments 'in the nature of support, maintenance or alimony.' " See, *e.g.*, *Cummings v. Cummings*, 244 F.3d 1263, 1265-66 (11th Cir. 2001); *In re Renzulli*, 28 B.R. 41, 43-46 (Bankr. N.D. Ill. 1982); *In re Petoske*, 16 B.R. 412, 414 (Bankr. E.D. N.Y. 1982);

*Tilmon*, 9 B.R. at 987-88; *In re Lineberry*, 9 B.R. 700, 706-10 (Bankr. W.D. Mo. 1981). Although this case does not involve a bankruptcy proceeding, we find useful the factors courts have employed to determine the dischargeability of a debt under federal bankruptcy law in determining whether the parties' intended the "cash payments" provided for in paragraph 8.4 of the MSA as maintenance or whether they intended them as part of a division of property assets. See *Truhlar*, 404 Ill. App. 3d at 181-83 (examining federal bankruptcy law in deciding whether the payment of all or part of the college education of a child who has reached the age of majority constitutes payment for "the support and maintenance of the child" within the meaning of the Social Security Act); but see *In re Marriage of Dundas*, 355 Ill. App. 3d 423, 427 (2005) (concluding that federal bankruptcy cases were not controlling in assessing whether a car loan payment was maintenance or part of a property settlement). We examine some of those authorities now.

¶ 56    Section 523(a)(5) of the Bankruptcy Code (11 U.S.C. § 523(a)(5) (2022)) provides for the nondischargeability of any debt "for a domestic support obligation." The Bankruptcy Code defines a "domestic support obligation" in relevant part as a debt that is owed to a spouse or former spouse "in the nature of alimony, maintenance, or support *** of such spouse [or] former spouse *** without regard to whether such debt is expressly so designated" and which is "established or subject to the establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of *** a separation agreement, divorce decree *** property settlement agreement[, or] an order of a court of record." 11 U.S.C. § 101(14A) (2022).

¶ 57    In determining whether a liability is in the nature of support under federal bankruptcy law, the label attached to an obligation and the language used in a decree, while relevant, is not controlling. *Cummings*, 244 F. 3d at 1265; *In re Marriage of Adamson*, 308 Ill. App. 3d 759, 768 (1999); *In re Paneras*, 195 B.R. 395, 401-02 (Bankr. N.D. Ill. 1996); *In re Marriage of Porter*,

229 Ill. App. 3d 697, 703 (1992); *Renzulli*, 28 B.R. at 43. A court must examine the substance of the order to determine the nature of an obligation. *Adamson*, 308 Ill. App. 3d at 768; *Tilmon*, 9 B.R. at 988. State and federal courts have identified several factors useful in determining whether an obligation is properly characterized as support or as part of a property settlement. See *Paneras*, 195 B.R. at 401-02 (identifying nine factors); *Porter*, 229 Ill. App. 3d at 703-04 (citing Collier Family Law and the Bankruptcy Code (MB) ¶ 6.04 (1991)) (identifying seven factors). Those factors include: (1) whether the obligation terminates upon the death or remarriage of either party; (2) whether the obligation is payable in a lump sum or in installments over a period of time; (3) whether the payments attempt to balance the parties' income; (4) the characterization of the obligation in the decree; (5) the placement of the obligation in the decree; (6) whether there is a separate mention of support payments in the decree; (7) whether there is a large differential in the parties' net income; (8) whether the obligation was thought to be taxable to the recipient; (9) whether the payment due the recipient is clearly identified as proceeds from the sale of what had been a marital asset; (10) whether the lack of a spouse's receipt of substantial assets reflects the need for support; (11) whether there is a waiver of maintenance in the settlement agreement; and (12) whether there is an ability to obtain a modification. *Adamson*, 308 Ill. App. 3d at 768; *Paneras*, 195 B.R. at 401-02; *Porter*, 229 Ill. App. 3d at 703-04. No list of factors is exhaustive or exclusive. *Adamson*, 308 Ill. App. 3d at 768-69. The critical inquiry is whether the divorce court and the parties intended to provide support or divide marital property and debts. *Adamson*, 308 Ill. App. 3d at 769; *Paneras*, 195 B.R. at 402; *Tilmon*, 9 B.R. at 988.

¶ 58    After reviewing the MSA in light of the factors and cases set forth above, we conclude that the parties' clearly and unambiguously intended that the "cash payments" provided for under paragraph 8.4 of the MSA to be part of a property settlement. Although the placement of an

obligation in a marital settlement agreement is not controlling (*Adamson*, 308 Ill. App. 3d at 768), we initially observe that this obligation appears in Article VIII of the MSA, labelled "Property Settlement for Wife." See *Paneras*, 195 B.R. at 401-02 (considering heading in marital settlement agreement under which obligation appears as one factor in determining obligation's nature). Looking beyond the heading, we note that Article VIII allocates assets that undisputably qualify as property, including bank accounts, investment accounts, retirement accounts, business interests, personal property, a vehicle, and insurance policies. Further, a similar provision in Article IX allocated similar assets to respondent. Other paragraphs in Article VIII reference the nature of the article as allocating a property settlement. Paragraph 8.6 states that "[e]xcept as otherwise specifically provided for in this [MSA], all transfers required to effectuate [petitioner] receiving the *property settlement described in this Article VI* [*sic*] shall be completed within 30 days from the effective date of this Agreement."[3] (Emphasis added.) Further, paragraph 8.8 states that "*[t]he division of property under this article* herein [*sic*] is contemplated and intended to be a non-taxable division to both [petitioner] and [respondent] of mutually acquired property." (Emphasis added.) Thus, even putting aside the heading, the substance of Article VIII, which also references a "property settlement" or "division of property," evinces the parties' intention to treat the assets designated therein, including the "cash payments" under paragraph 8.4, to be part of a property settlement.

¶ 59    Further supporting this notion is the fact that the MSA contains an entirely separate article for the payment of maintenance. Under paragraph 3.2 of Article III, respondent agreed to pay petitioner "non-modifiable maintenance" in the amount of $4,412 per month commencing on May

---

[3] The reference to "Article VI" in paragraph 8.6 is clearly a typographical error as Article VI governs higher educational expenses.

1, 2014, and on the first day of each month thereafter until respondent made 102 payments totaling $450,000. See *Paneras*, 195 B.R. at 402 (noting that the separate mention of support payments in a marital settlement agreement indicates that other obligations are not for support). In addition, we observe that paragraph 3.3 of the MSA provides that the sums paid by respondent to petitioner pursuant to paragraph 3.2 of Article III "are acknowledged to be paid incident to the Judgment and in discharge of [respondent's] legal obligation to *support [petitioner]*." (Emphasis added.) No such comparable language appears in Article VIII.

¶ 60    Article III also includes a "Maintenance Waiver." Paragraph 3.1 states that "except for the maintenance that is provided for in this [MSA]," petitioner waives any and all claims against respondent for maintenance. The only express provision for maintenance in the MSA is in paragraph 3.2 of Article III. Indeed, as part of the maintenance waiver, petitioner agreed that she is able to be self-supporting through appropriate employment and/or through property ownership, including marital and non-marital property apportioned to her through the MSA. We find it significant that, except for the maintenance provided for in the MSA (and only the payments under paragraph 3.2 of Article III are labelled as maintenance), the parties waived any right to maintenance. See *Adamson*, 308 Ill. App. 3d at 770 (finding that absence of maintenance waiver supported notion that parties intended to treat obligation as support); *Porter*, 229 Ill. App. 3d at 704 (noting that waivers of maintenance in a marital settlement agreement are relevant in determining whether an obligation is support or property).

¶ 61    Article XVI of the MSA is labelled "General Provisions." Paragraph 16.5 of Article XVI provides that respondent's obligations to pay petitioner "shall be non-modifiable for any reason, even if [petitioner] is employed or has separate income or has married, or if [respondent] is no longer employed, or is disabled, or has married, or has died." The same paragraph of the MSA

provides that respondent's obligations under the MSA "shall survive [petitioner's] death and be payable to her estate, or, if [respondent] is no longer living, at the option of [respondent's] executor or personal representative, in a lump sum." Thus, the obligation does not terminate upon the death or remarriage of either spouse. This suggests the "cash payments" under paragraph 8.4 were part of the parties' property settlement and not for support. Compare *Adamson*, 308 Ill. App. 3d at 769 (holding that parties' agreement that the obligation was nonmodifiable and would survive the obligor's death suggests that the obligation was part of a property settlement) with *Paneras*, 195 B.R. at 401 (noting that the termination of an obligation upon the death or remarriage of either spouse indicates the obligation was for support) and *Porter*, 229 Ill. App. 3d at 704 (same). No contrary language appears in Article VIII.

¶ 62    Finally, we observe that, for taxation purposes, the parties treated the maintenance provided for in paragraph 3.2 of the MSA differently than the "cash payments" provided for in paragraph 8.4 of the MSA. Under paragraph 3.3 of the MSA, the sums paid pursuant to paragraph 3.2 are "includible in [petitioner's] gross income [and] *** deductible from [respondent's] gross income for purposes of federal and state income taxation." In contrast, paragraph 8.8 states that the obligations under Article VIII are "non-taxable transaction[s]." These provisions reinforce the notion that the "cash payments" pursuant to paragraph 8.4 are not for support. See *Adamson*, 308 Ill. App. 3d at 770 (noting that agreement that included clear language indicating that the parties intended payments to be taxable to the recipient suggested they were in the nature of support); *Paneras*, 195 B.R. at 402 (noting that fact that payments were thought to be taxable indicate the payments were for support). Considering the foregoing, we conclude that the parties clearly and unambiguously intended to treat the "cash payments" provided for under paragraph 8.4 of the MSA as part of a property settlement. See *Hulstrom*, 342 Ill. App. 3d at 269 (noting that when

contract language is unambiguous, it must be given its plain and ordinary meaning without reference to parol evidence).

¶ 63    In arguing that the "cash payments" provided for in paragraph 8.4 of the MSA are "in the nature of alimony" and should be treated as support, petitioner does not address the factors we discuss above. Instead, she relies principally on what she classifies as a disparity in the parties' financial situation and the fact that the "cash payments" are to be made at monthly intervals over a long term. We agree that the fact that the "cash payments" are to be made in installments indicates that they are in the nature of support. See *Adamson*, 308 Ill. App. 3d at 770; *Paneras*, 195 B.R. at 401; *Porter*, 229 Ill. App. 3d at 704. We note, however, that the method of payment is not determinative in itself. *In re Marriage of Rowden*, 163 Ill. App. 3d 869, 872 (1987).

¶ 64    With respect to petitioner's claim that there is a disparity in the parties' financial situation, petitioner insists that her "need for substantial monthly cash payments bespeaks her need for financial support at the time of the JDM." She claims that the fact that the MSA requires respondent to pay her over $3 million reflects the disparity in the parties' relative financial situations. In support, petitioner relies heavily on a premarital agreement (PMA) executed by the parties. According to petitioner, the PMA reflected the parties' relative financial conditions and showed her net worth as only 1% of respondent's. She also asserts that, "during the marriage," her total income was less than 10% of respondent's. We find these arguments unavailing for multiple reasons.

¶ 65    First, the preamble of the MSA reveals that the parties agreed to resolve their distribution of property "[n]otwithstanding the terms of the [PMA] and without opining on its validity." Petitioner does not provide a convincing argument as to why this court should now consider the PMA, despite the MSA acknowledging its existence and agreeing to a division of property

notwithstanding the terms of the PMA. Second, it is the parties' circumstances at the time of the dissolution that is significant in ascertaining the nature of an obligation. *Porter*, 229 Ill. App. 3d at 703 (citing Collier Family Law and the Bankruptcy Code (MB), ¶ 6.04[2] (1991)). The parties were married for almost 20 years. Thus, their financial status at the time of the marriage is not indicative of their financial status at the time of dissolution. While petitioner claims that, "during the marriage," her total income was less than 10% of respondent's, she does not cite us to any evidence of the parties' respective incomes at the time of dissolution. And while petitioner does claim that the value of the assets she was awarded were worth roughly 2% of the assets awarded to respondent, she does not direct us to evidence in the record supporting that claim. Accordingly, we find these arguments forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (providing that an argument that does not cite the record is forfeited on appeal); *One Black 2016 Jeep Wrangler Unlimited*, 2025 IL App (2d) 240314, ¶ 28. Regardless, even accepting petitioner's claim that there was a disparity in the parties' financial situation, and considering that the "cash payments" are to be made in installments, an application of other factors conclusively demonstrates that the parties clearly and unambiguously intended the "cash payments" under paragraph 8.4 to be part of a property division.

¶ 66    Petitioner faults respondent for taking inconsistent positions about the nature of the cash payments. According to petitioner, "[s]ince 1992 and throughout the litigation," when it suited him, respondent described the "cash payments" provided for by paragraph 8.4 of the MSA as "alimony."[4] Petitioner directs us to some bank documents in support of this claim. Again, however, it is not the label given to an obligation that dictates how it is treated. It is the substance of the

_____

[4] We presume the reference to 1992 is a typographical error since the MSA did not take effect until 2014.

obligation. As noted above, the MSA clearly and unambiguously indicates that the parties intended the "cash payments" to be part of the property settlement. Parenthetically, we point out that petitioner's description of the "cash payments" was also inconsistent. Petitioner argues before this court that the "cash payments" provided for in paragraph 8.4 of the MSA are "in the nature of alimony." But, in her reply to respondent's response to petitioner's motion to dismiss respondent's motion to allocate payments of judgment, petitioner refers to the "cash payments" as "property" multiple times. In that filing, petitioner states that her "Petition for Contempt granted by the Honorable Judge Smith clearly states the amounts of unpaid maintenance and *unpaid cash property settlement payments* together with the interest owed on each." (Emphasis added.) In the same document, petitioner denies that "Judge Smith's order granting the relief she requested in her Petition [for contempt] did not allocate which of the payments she attributed to spousal maintenance and which *she attributed to property settlement* because [petitioner] made specific allegations regarding each." (Emphasis added.)

¶ 67    Petitioner claims that the trial court had a duty to examine whether the "cash payments" under paragraph 8.4 of the MSA constituted maintenance and this required a hearing at which evidence and arguments regarding the various factors could be presented. We disagree. As discussed above, applying the abundant evidence of record to the factors considered in federal bankruptcy cases, cases for which petitioner advocates, overwhelmingly supports a finding that the parties clearly and unambiguously intended the "cash payments" provided for under section 8.4 of the MSA to be part of a property settlement. We therefore fail to see what a remand for additional evidence would accomplish.

¶ 68    For the reasons set forth above, we reject petitioner's contention that the "cash payments" provided for in paragraph 8.4 of the MSA are "in the nature of alimony" and should be treated as

support for the purposes of garnishing respondent's social security benefits.

¶ 69                                    C. Calculation of Maintenance Amount

¶ 70     Finally, in a scant two-and-a-half pages, petitioner also argues that even if respondent's maintenance obligation is limited to the amount of maintenance provided for in paragraph 3.2 of the MSA, Judge Betar erred by refusing to consider evidence in the record to ascertain that amount which, according to petitioner, is easily calculable. Petitioner then sets forth what she believes is the appropriate methodology for calculating the amount.

¶ 71     The only authorities petitioner cites for the proposition she raises is section 504(b-7) of the Marriage Act (750 ILCS 5/504(b-7) (West 2022)) and *Halloran v. Dickerson*, 287 Ill. App. 3d 857 (1997). Section 504(b-7) of the Marriage Act provides that each maintenance payment is to be treated as a judgment with "each such judgment to be deemed entered as of the date the corresponding payment *** becomes due under the terms of the support order." 750 ILCS 5/504(b-7) (West 2022). *Halloran* contains an extensive analysis regarding the proper method to calculate and apply the accrual of interest on a judgment. *Halloran*, 287 Ill. App. 3d at 862-70. Importantly, however, petitioner cites no authority that Judge Betar was obligated (or had the authority) to calculate the amount of unpaid maintenance included in the September 8, 2020, judgment order after Judge Smith determined that he did not have jurisdiction to reconstruct the September 8, 2020, order more than two years after its entry and determine what portion was attributable to maintenance. Compare *Waggoner v. Waggoner*, 78 Ill. 2d 50, 53-54 (1979) (holding that trial court was without jurisdiction to hear the wife's "motion to clarify" filed more than 30 days after entry of divorce decree because the wife's motion sought "to engraft new obligations onto the decree") with *In re Marriage of Klose*, 2023 IL App (1st) 192253, ¶¶ 36-41 (suggesting that trial court maintained jurisdiction pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-

1401 (West 2020)) to hear the wife's motion to clarify a judgment of dissolution filed more than 30 days, but less than two years, after entry of said judgment). Thus, she has forfeited any claim that Judge Betar erred by refusing to calculate the portion of the September 8, 2020, judgment order attributable to maintenance under paragraph 3.2 of the MSA. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *People v. Ward*, 215 Ill. 2d 317, 332 (2005) ("A point raised in a brief but not supported by citation to relevant authority fails to satisfy the requirements of Supreme Court Rule 341(h)(7) *** and is therefore forfeited."); *Jackson Generation, LLC v. County of Will*, 2024 IL App (3d) 220328, ¶ 66 (noting that a point not supported by citation to relevant authority results in forfeiture of the issue); *Trilsky v. City of Chicago*, 2019 IL App (1st) 182189, ¶ 54 ("The failure to elaborate on an argument, cite persuasive authority, or present a well-reasoned theory violates Rule 341(h)(7) and results in forfeiture of the argument.").

¶ 72     Moreover, even if it was error for Judge Betar to not calculate the amount of unpaid maintenance included in the September 8, 2020, judgment order, we conclude that petitioner invited the error. The doctrine of invited error prohibits a party from requesting to proceed in one manner and then arguing on appeal that the requested action was error. *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004); *Pellico v. Mork*, 2018 IL App (2d) 170468, ¶ 20. The rationale for the doctrine is that it would be manifestly unfair to grant a party relief based on an error that the party introduced into the proceedings. *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 33; *Pellico*, 2018 IL App (2d) 170468, ¶ 20.

¶ 73     Here, petitioner induced and invited Judge Smith to find that respondent's motion to allocate the September 8, 2020, judgment was untimely. Yet, she later requested Judge Betar to address that same issue. *Cf. Strojny v. Egeland*, 132 Ill. App. 2d 779, 780-81 (1971) (noting that judge overseeing supplementary proceedings had no authority to alter judgments presented to

him). When Judge Betar refused because Judge Smith had already decided the issue, petitioner appealed. She now asks this court to find Judge Betar's decision not to address the issue as error. We decline to do so, however, because any error in Judge Betar's ruling was invited by petitioner when she opposed respondent's motion to allocate the September 8, 2020, judgment as untimely. As Judge Betar properly concluded, petitioner's request constitutes "a second bite at the apple, forum shopping, or a hope at getting a better result in front of a different Judge."

¶ 74                                III. CONCLUSION

¶ 75      For the reasons set forth above, we affirm the judgment of the circuit court of Lake County.

¶ 76      Affirmed.